1  HARMEET K. DHILLON, ESQ ( SBN: 207873)
   HAROLD P. SMITH, ESQ (SBN: 126985)
2  DAVID LIHWEI LIN, ESQ. (SBN: 243448)
3  DHILLON & SMITH LLP
   214 Grant Avenue, Suite 400
4  San Francisco, CA 94108
   Telephone: (415) 433-1700
5  Facsimile: (415) 520-6593
6

**FILED**

DEC 1 7 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7  Attorneys for Plaintiffs
   Sigma Six Technologies, Inc. and
8  Sigma Six Consulting, LLC.

E-filing

9
10            UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                   San Jose Division

13        CV  08       5633       PVT
14

15  SIGMA SIX TECHNOLOGIES, INC., a          Case No.
    New York corporation and SIGMA SIX       _____
16  CONSULTING, LLC, a New York limited
17  liability company,                       **Complaint for Breach of Contract,**
                                             **Misappropriation of Trade Secrets,**
18            Plaintiffs,                    **Conversion, Unfair Competition,**
                                             **Tortious Interference with Contract, and**
19  v.                                       **Tortious Interference with Economic**
                                             **Advantage**
20
21  NAGARRO, INC., a New Jersey
    corporation, T-SYSTEMS ENTERPRISE        Jury trial demanded
22  SERVICES GmbH, a German business
23  entity, and DOES 1-10.

24            Defendants.

25

26      Plaintiffs Sigma Six Technologies, Inc. ("SST") and Sigma Six Consulting, LLC
27  ("SSC"), by their attorneys Dhillon & Smith LLP, for their complaint against Nagarro Inc.
28

---

Complaint                                          Dhillon & Smith LLP

                        Page 1

("Nagarro"), T-Systems Enterprise Services GmbH (formerly known as T-Systems International GmbH) ("T-Systems"), and Does 1 through 10, inclusive, hereby allege upon personal knowledge as to their own conduct and upon information and belief as to Defendants' and third party conduct, as follows:

1.      This is an action for breach of contract; misappropriation of trade secrets under California Civil Code §§ 3426 *et seq.*; tortious interference with contract under California common law; and unfair competition under California Business and Professions Code §§ 17200 *et seq.*

### Parties

2.      SST is a corporation duly organized and existing under the laws of the state of New York since 1994, with its principal place of business in New York, New York.

3.      SSC is a corporation duly organized and existing under the laws of the state of New York since 2003, with its principal place of business in New York, New York.

4.      SST and SSC both are wholly owned by their founder, Harry Singh ("Singh").

5.      Nagarro is a corporation organized under the laws of the state of New Jersey with its principal place of business at 1790A Technology Drive, San Jose, California.

6.      T-Systems is a division of Deutsche Telekom based in Frankfurt, Germany.

---

Complaint                                                    Dhillon & Smith LLP

7.     Plaintiffs are ignorant of the true names of Defendants Does 1 through 10, inclusive, and therefore sue them by the foregoing fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when they are ascertained.

8.     Plaintiffs are informed and believes, and based thereon alleges, that at all times herein, each of the Defendants, including Does 1 through 10, was acting as the agent of each of the other Defendants and was at all times acting within the scope of such agency, with the approval and ratification of the remaining Defendants.

## Jurisdiction and Venue

9.     This Court has diversity jurisdiction over the claims alleged herein pursuant to 28 U.S.C. 1332(a)(3), as there is complete diversity among plaintiffs and defendants, and the amount in controversy exceeds $75,000.

10.     This Court has personal jurisdiction over Nagarro because it has purposefully availed itself of this district and the state of California as it principal place of business, and because it transacts a substantial amount of business in this district.

11.     This Court has personal jurisdiction over T-Systems because T-Systems has conducted business in this district, including, *inter alia,* entertaining and entering into a business relationship with Nagarro, which is headquartered in this district. Upon information and belief, T-Systems has numerous clients in the United States.

12.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because, *inter alia,* a substantial portion of the events giving rise to this lawsuit took place in this district, and Nagarro resides in this district for purposes of personal jurisdiction.

Complaint                                                      Dhillon & Smith LLP

1    Moreover, venue is proper for defendant T-Systems because, pursuant to 28 U.S.C. §

2    1391(d), an alien may be sued in any judicial district.

### Intradistrict Assignment

**13.**    Pursuant to Civil Local Rule 3-2(e) this case should be assigned to the San

Jose division of this Court because many of the claims alleged herein arose in Santa Clara

County.

### The Development of SST's ServiceNet Software

**14.**    SST provides comprehensive custom eBusiness solutions for growing

enterprises, including software development, building Intranets/Extranets, software

implementation and maintenance, and training.

**15.**    SSC provides software and business consulting services and has clients

around the world. SSC was formed in 2003.

**16.**    SST and SSC are parties to an agreement whereby SSC has the exclusive

right to license and/or sell software developed by SST.

**17.**    SST and T-Systems entered into an agreement in 2001 whereby SST would

develop Infrastructure Management Systems software for T-Systems Schweiz AG.

**18.**    In December 2002, SSC negotiated a contract with T-Systems to develop a

customized inventory and service management system known as ServiceNet

("ServiceNet"), with additional service management components to be added in the

future. The contract between T-Systems and SSC ("T-Systems Agreement") was reduced

Complaint                                                    Dhillon & Smith LLP

to written form and signed in June, 2003. A copy of the original T-Systems Agreement in German, with English translation, is attached hereto as Exhibit A.

19.    ServiceNet is a web-based IT Services management software for managing a company's technology services, infrastructure and processes. Its multi-lingual user interface includes features to manage computer inventory, technology processes, workflows, users and overall monitoring of IT services delivery. ServiceNet works with major user directory services and inventory databases.

20.    The T-Systems Agreement was further supplemented by additional Schedules detailing various aspects of the ServiceNet project, including specific modules tailored for use by T-Systems with certain specific customers.

21.    In addition to a basic contract price for the first version of ServiceNet and the license for its use, the T-Systems Agreement provided that SSC would perform software upkeep and enhancement of the project at least through the end of December, 2012, with corresponding payments to SSC according to a schedule of payments. The total value of the ten-year T-Systems Agreement exceeded $3 million.

22.    According to publicly available information, Nagarro, a San Jose-based company with a large back office in Gurgaon, India, provides outsourced software development services to companies around the world. Nagarro advertises itself as a Microsoft Gold Certified Partner with great depth of expertise in Microsoft technology development. Upon information and belief, Nagarro has over 400 employees in India.

Complaint                                                          Dhillon & Smith LLP

23.     SST negotiated a contract with Nagarro to perform software development services relating to ServiceNet as well as the software that SST provided to T-Systems Schweiz AG. The terms of the agreement between Nagarro and SST were reduced to written form (the "Nagarro Agreement"), dated December 1, 2001.  The Nagarro Agreement included specific terms concerning the schedule of delivery to SST of the ServiceNet software, the number of Nagarro personnel dedicated to the project, and monthly fees varying according to the project's stages. A copy of the Nagarro Agreement is attached hereto and incorporated herein by reference as Exhibit B.

24.     Among other terms, the Nagarro Agreement provided that SST would have exclusive ownership rights to all intellectual property developed by Nagarro pursuant to the agreement. The Nagarro Agreement also provided specifically that Nagarro would never approach or solicit SST's customer(s) directly, nor would it divulge SST's confidential information – including the software code written for SST – to any third party.

25.     Nagarro began developing the predecessor to the ServiceNet software, IMS (Infrastructure Management System, later renamed ServiceNet) according to plan in late 2001, and SST paid fees due under the Agreement accordingly. The ServiceNet software developed by Nagarro for SST was written in the Microsoft Visual Basic ASP programming language.

26.     SSC provided the first version of ServiceNet to T-Systems for its acceptance testing on January 12, 2004. This version was designated ServiceNet 2.7.0.

---

Complaint                                                           Dhillon & Smith LLP

27.     Other than providing ServiceNet 2.7.0 and further releases to T-Systems for acceptance testing purposes, neither SST nor SSC have divulged the ServiceNet code to third parties. Neither SST nor SSC has given permission to any party to use the ServiceNet software, nor any version or derivation thereof.

**Nagarro and T-Systems Begin Working Together**

28.     Unbeknownst to Plaintiffs at the time, upon information and belief T-Systems and Nagarro executives met several times starting in the third quarter of 2004 to discuss how T-Systems could deal directly with Nagarro to roll out and further develop the ServiceNet software, cutting Plaintiffs out completely and taking their intellectual property without payment.

29.     During the second half of 2004, T-Systems' manager for the ServiceNet project, Andreas Schneiber, met in Hamburg with  Till Hahndorf, Nagarro's General Manager for Germany, to discuss moving forward with the ServiceNet project without T-Systems having to pay SSC, but rather paying Nagarro directly instead.

30.     During the fourth quarter of 2004, following the meeting between Schneiber and Hahndorf in Hamburg, Schneiber and his deputy, Andreas Frenzel travelled to India to meet with Nagarro's President, Vikas Sehgal, in Nagarro's offices in Gurgaon. Upon information and belief, Nagarro caused the T-Systems' representatives' visas to India to be expedited through letters to the Indian Consulate in Germany.

31.     During and after the 2004 Gurgaon meeting described above, Nagarro and T-Systems reached an agreement whereby T-Systems would directly pay Nagarro for

Complaint                                                          Dhillon & Smith LLP

further development of SST's ServiceNet software, and that both parties would cease to honor their agreements with SST and SSC, respectively.

32.    Pursuant to their scheme to breach their contracts and defraud SST and SSC, Nagarro and T-Systems agreed that T-Systems would use a shell company, Dongleware Verlags GmbH ("Dongleware") located in Leimen, Germany, through which T-Systems would make payments indirectly to Nagarro for the ServiceNet project.

33.    Upon information and belief, beginning as early as mid-2006, T-Systems has been making payments for ServiceNet software development directly to Nagarro.

34.    Nagarro continued to use the same team of software engineers in Gurgaon on behalf of T-Systems as had been working on the ServiceNet project on SST's behalf.

35.    Nagarro wrote new versions and modules of the ServiceNet software that belonged to SST in Microsoft Visual Basic Dot Net programming language, and began providing these new versions of the ServiceNet software, derived from SST's version, to T-Systems directly starting on or about 2005.

36.    On or about November 8, 2004, Nagarro's German office created an invoice for T-Systems through DONGLEWARE in the amount of € 250,000 for the ServiceNet version 2.7. The amount of € 250,000 is the same dollar amount assigned to the ServiceNet software under a software buyout clause in the T-Systems Agreement.

37.    As of June, 2005, Nagarro was registered as a vendor with T-Systems. Upon information and belief, Nagarro produces no products or services for T-Systems that are unrelated to the ServiceNet software.

Complaint                                                          Dhillon & Smith LLP

38.     During the years 2006 and 2007, T-Systems has directly paid Nagarro over €

2 Million in relation to the ServiceNet project. Upon information and belief, T-Systems

made additional payments to Nagarro through Dongleware.

### T-Systems Breaches its Agreement with SSC

39.     T-Systems initially made payments to SSC under the T-Systems Agreement

starting in September, 2003 and continuing until October, 2004, when T-Systems abruptly

stopped paying Sigma its fees. T-System claimed as its reason for non-payment that the

ServiceNet software that SSC delivered had "failed" its acceptance tests.

40.     T-Systems' rejection of the ServiceNet software in October, 2004  for alleged

non-conformity and/or non-performance was a pretext concocted between T-Systems

and Nagarro to justify T-Systems' non-payment of fees due to SSC under the T-Systems

Agreement, and to further T-Systems' and Nagarro's scheme to work directly and cut

SSC and SST out of their respective relationships.

41.     Upon information and belief, T-Systems breached the T-Systems

Agreement by failing to make payments to SSC due thereunder as a direct result of T-

Systems' agreement with Nagarro to purchase the ServiceNet software and further

developments of the software from Nagarro directly rather than through SSC.

### Nagarro Breaches its Agreement with SST

42.     Nagarro delivered ServiceNet work to SST pursuant to the Nagarro

Agreement until March 15, 2005, when it surreptitiously entered into an agreement with

---

Complaint                                                        Dhillon & Smith LLP

1  T-Systems and ceased its work under the Nagarro Agreement, claiming non-payment of

2  fees by SST.

3     43.    Upon information and belief, at the time that Nagarro ceased producing

4
5  ServiceNet work to SST, it had already entered into an agreement directly with T-

6  Systems to continue developing the ServiceNet software directly for T-Systems.

7     44.    Nagarro's cessation of work on the ServiceNet project for SST was as a

8
9  direct consequence of T-Systems' agreement with Nagarro to purchase the ServiceNet

10  software, and improvements and additions thereto, directly from Nagarro in violation of

11  Nagarro's contract with SST.

12
13                    **The Launch of ServiceNet**

14     45.    Following T-Systems' breach of the T-Systems Agreement, it nonetheless

15  used the ServiceNet software that it had been provided for testing by SSC and which it

16
17  claimed to reject for non-performance on October 25, 2004.

18     46.    Upon information and belief, T-Systems obtained the source code for

19  ServiceNet from Nagarro. As of mid-2004, only Nagarro, SST and SSC had access to the

20
21  source code for ServiceNet, and T-Systems could not have obtained the source code from

22  any other source.

23     47.    T-Systems launched version 3.0 of ServiceNet for use with its customers by

24
25  October, 2005. Upon information and belief, the version of ServiceNet initially launched

26  by T-Systems in 2005 is derived directly from the version of ServiceNet 2.7 that was

27  provided by SSC to T-Systems for testing in mid-2004.

28

---

Complaint                                    Dhillon & Smith LLP

48.     T-Systems continues to use the ServiceNet software as its key tool for inventory and resource management with its customers. The user interface for ServiceNet, as demonstrated by user manuals, screen shots, marketing materials and other indicia, is derived directly from the ServiceNet software initially provided by SSC to T-Systems. Only minor modifications have been made to the original ServiceNet's functionality. Numerous major U.S. corporations are now using versions of ServiceNet delivered through T-Systems' corporate affiliates.

49.     Nagarro and T-Systems are actively engaged in an ongoing contractual relationship whereby Nagarro provides maintenance and new functionality to the ServiceNet software.  For example, in 2007 Nagarro forwarded a detailed written proposal to T-Systems entitled "Business Proposal for Supplying Product Components for T-Systems ServiceNet – Phase I. This document makes reference to an existing written contract between Nagarro and T-Systems entitled "T-Systems ServiceNet Requirements Specification, Delivery and Approval Process." The document references a number of new software components that will be "delivered by Nagarro, packed under planned release versions and will plug-in or build over the existing ServiceNet product framework."

**First Cause of Action**
**Breach of Contract**
**By SST Against Nagarro**

50.     Plaintiffs repeat and incorporate by reference each allegation in paragraphs 1-49.

---

Complaint

Dhillon & Smith LLP

51.     SST has a valid and existing written contract with Nagarro, the Nagarro Agreement (Ex. B).

52.     Among the obligations in the Nagarro Agreement are its confidentiality and intellectual property ownership provisions, set forth in ¶ 6.

53.     Paragraph 6.1 of the Nagarro Agreement, *inter alia*, obligates Nagarro to keep SST's confidential information strictly confidential, and not to allow any third party to "examine, copy or learn of, any Confidential Information without the express written consent of [SST]."

54.     Paragraph 6.2 of the Nagarro Agreement, *inter alia*, bars Nagarro from using or disclosing SST's confidential information, including making copies of the ServiceNet software.

55.     In direct violation of ¶ ¶ 6.1 and 6.2 of the Nagarro Agreement, Nagarro disclosed SST's confidential information – the ServiceNet software – to T-Systems, and also used ServiceNet as the basis for further software development based directly on ServiceNet.

56.     Nagarro used SST's confidential information – including the ServiceNet software, and T-Systems' status as the ultimate licensee of ServiceNet – for its own, unauthorized purposes, to the detriment of SST.

57.     SST has been irreparably harmed by Nagarro's usurpation of the ServiceNet software and other confidential information imparted by SST pursuant to the Nagarro Agreement.

Complaint                                              Dhillon & Smith LLP

58.    SST has performed all of its obligations under the Nagarro Agreement other than those obligations whose performance is excused by virtue of Nagarro's breaches of the Agreement.

59.    SST is entitled to recover the damages it has sustained and will continue to sustain as a result of Nagarro's breaches of ¶¶ 6.1 and 6.2 of the Nagarro Agreement. SST is further entitled to recover from Nagarro the gains, profits and advantages it has obtained as a result of said breaches. The amount of SST's monetary damages are to be determined at trial, but are believed at this time to exceed $3,000,000.

60.    As provided in the Nagarro Agreement at ¶ 6.3, SST is entitled to injunctive relief for the irreparable harm caused by Nagarro's unauthorized use and disclosure of the ServiceNet software and other confidential and proprietary information belonging to SST.

**Second Cause of Action**
**Trade Secret Misappropriation**
**(California Civil Code § 3426 *et seq.*)**
**By SST Against Nagarro and Does 1-10**

61.    Plaintiffs repeat and reallege each allegation in paragraphs 1- 60.

62.    SST owns valuable trade secrets, including the contents of the ServiceNet software and the identity of the ultimate customer for ServiceNet, T-Systems.

63.    SST disclosed its trade secrets, including the contents of the ServiceNet software, instructions for improvements and modifications to the ServiceNet software, and the nature of the ultimate customer's needs, to Nagarro pursuant to the Nagarro

Agreement, with the express understanding that all such trade secrets disclosed by SST

to Nagarro were to be maintained in the strictest confidence by Nagarro.

64.     Nagarro and those acting in concert with it, designated herein as Does 1-10,

have deliberately and wrongfully misappropriated SST's trade secrets, including the

ServiceNet software and the identity of T-Systems as the ultimate customer for

ServiceNet, causing harm to SST.

65.     SST is entitled to recover the damages it has sustained and will continue to

sustain as a result of Nagarro's and Does 1-10's misappropriation of SST's trade secrets.

SST is further entitled to recover from them the gains, profits and advantages they have

obtained as a result of said trade secret misappropriation. The amount of such damages

shall be determined at trial, but are believed to exceed the sum of $3,000,000.

66.     Nagarro's and Does 1-10's conduct constitutes willful and malicious

misappropriation pursuant to California Civil Code § 3426.3(c) and 3426.4, warranting

the award of exemplary damages and attorneys' fees.

67.     SST will continue to suffer irreparable harm if Nagarro's and Does 1-10's

unlawful misappropriation of its trade secrets is permitted to continue. Therefore, SST is

entitled to injunctive relief restraining Nagarro and all persons acting in concert

therewith from the unauthorized use and disclosure of the ServiceNet software and other

confidential and proprietary information belonging to SST.

Complaint                                                           Dhillon & Smith LLP

### Third Cause of Action
### Intentional Interference with Contract
### By SST against T-Systems

**68.**     Plaintiffs repeat and reallege each allegation in paragraphs 1- 67.

**69.**     SST had a valid and existing contract with Nagarro, a copy of which is attached hereto as Exhibit B.

**70.**     T-Systems became aware of the Nagarro Agreement during the course of its relationship with SSC. Among other facts, T-Systems personnel interacted directly with Nagarro personnel during the course of the delivery of the ServiceNet software to T-Systems by SSC in 2003, 2004 and 2005.

**71.**     T-Systems wrongfully and intentionally interfered with the Nagarro Agreement by, *inter alia*, agreeing to purchase ServiceNet directly from Nagarro, knowing that ServiceNet was being developed by Nagarro exclusively for SST.

**72.**     T-Systems' wrongful interference with the Nagarro Agreement caused Nagarro's breach of the Agreement.

**73.**     T-Systems deliberately concealed its interference with the Nagarro Agreement. SST did not know, nor could it have learned by diligent effort, of T-Systems' wrongful interference with the Agreement, at the time it occurred.

**74.**     SST has been damaged by virtue of T-Systems' wrongful interference with the Nagarro Agreement. Because T-Systems' conduct was willful and malicious, SST is entitled to an award of exemplary damages to deter further such misconduct by T-Systems in the future.

---

Complaint

Dhillon & Smith LLP

### Fourth Cause of Action
### Intentional Interference with Contract
### By SSC Against Nagarro

75.     Plaintiffs repeat and reallege each allegation in paragraphs 1- 74.

76.     SSC had a valid contract with T-Systems, the T-Systems Agreement.

77.     Nagarro became aware of the T-Systems Agreement during the course of Nagarro's relationship with SST and Singh. Among other facts, T-Systems personnel interacted directly with Nagarro personnel during the course of the delivery of the ServiceNet software to T-Systems by SSC in 2003, 2004 and 2005.

78.     Nagarro wrongfully and intentionally interfered with the T-Systems Agreement by, *inter alia*, agreeing to sell ServiceNet directly to T-Systems, knowing that T-Systems had agreed to license ServiceNet directly from SSC.

79.     Nagarro's wrongful interference with the T-Systems contract caused T-Systems to breach the T-Systems Agreement, including by rejecting the suitability of ServiceNet 2.7 in bad faith, and refusing to pay SSC the amounts due under the T-Systems Agreement.

80.     Nagarro deliberately concealed its interference with the T-Systems Agreement. Neither SST nor SSC knew, nor could they have learned by diligent effort, of Nagarro's wrongful interference with the T-Systems Agreement, at the time the interference occurred.

81.     SST has been damaged by virtue of T-Systems' wrongful interference with the Agreement. Because T-Systems' conduct was willful and malicious, SST is entitled to

an award of exemplary damages to deter further such misconduct by T-Systems in the future.

### Fifth Cause of Action
### Unfair Competition (Cal. Bus. & Prof. §17200 *et seq.*)
### By SST and SSC Against All Defendants

82.     Plaintiffs repeat and reallege each allegation in paragraphs 1- 81.

83.     Defendants' actions complained of above, including Nagarro's contracting directly with T-Systems to sell to it the ServiceNet software, and derivations therefrom, which rightfully belonged to SST and which SSC had an exclusive right to sell and/or license, constitute unlawful, unfair and fraudulent business acts and practices against SST and SSC in violation of California Business & Professions Code §§ 17200 *et seq.*

84.     Defendants' actions complained of above were independently wrongful in that, *inter alia,* they constitute misappropriation of trade secrets.

85.     Nagarro, T-Systems and Does 1-10 acting in concert with them deliberately concealed their unfair competition against SST and SSC. Neither SST nor SSC could have learned by diligent effort, of these unfair business practices at the time they began.

86.     As a direct and proximate result of Nagarro's unfair and unlawful practices described above, Plaintiffs have suffered and will continue to suffer harm to their businesses. Unless restrained and enjoined from doing so, Nagarro will continue to usurp SST's property, ServiceNet, for the purpose of delivering versions of it to T-Systems, and T-Systems will continue to benefit from ServiceNet without paying SSC for it.

Complaint                                                                    Dhillon & Smith LLP

87.     Plaintiffs' remedies at law are inadequate to compensate them for the injuries sustained and threatened by Nagarro's and T-Systems' unlawful practices, and Plaintiffs seek injunctive relief.

88.     As a direct and proximate result of Nagarro's unfair and unlawful activities, Nagarro has been unjustly enriched and SST and SSC are entitled to disgorgement of all monies Nagarro unjustly received as a result of its unlawful conduct in an amount to be determined at trial.

89.     As a direct and proximate result of T-Systems' unfair and unlawful activities, T-Systems has been unjustly enriched and SST and SSC are entitled to disgorgement of all monies T-Systems has unjustly retained, including increased profits from the use of ServiceNet software by its customers, a share of which were to have been paid to SSC pursuant to the T-Systems Agreement. The amount of said unjust enrichment is in an amount to be determined at trial.

### Prayer for Relief

Wherefore, Plaintiffs pray for the following relief:

1.     Judgment against Defendants, jointly and severally, awarding to Plaintiffs actual damages in an amount to be determined at trial, together with Defendants' profits derived from their breach of contract, unlawful misappropriation, tortious interference and unfair competition;

**2.** The issuance of a permanent injunction enjoining Defendants and all other persons working in concert with them, including all of T-Systems' customers around the world, from in any way using any version of ServiceNet;

**3.** An award of exemplary damages to deter Defendants from such unlawful and unfair business practices and trade secret misappropriation as they have committed against Plaintiffs;

**4.** Such other and further relief as this Court deems just and appropriate.

### DEMAND FOR JURY TRIAL

Under Fed. R. Civ. P. 38(b), Plaintiffs demands jury trial of all issues raised by the Complaint.

Date: December 16, 2008

Dhillon & Smith LLP

By: _____

Harmeet K. Dhillon
Harold P. Smith
David Lihwei Lin
Attorneys for Plaintiffs Sigma Six Technologies, Inc. and Sigma Six Consulting LLC

Complaint                                                    Dhillon & Smith LLP

# Exhibit A

# ·· **T** ·· Systems ·

## Rahmenvertrag

## für

## IT-Dienstleistungen

zwischen          **Sigma Six Consulting LLC**                                    Sigma
200 Rector Place, Suite 8x
New York, NY 10280
USA

und              **T-Systems International GmbH**                                TSI-CSU5
Service Line CDS
Customer Service Unit 5
Lademannbogen 21-23
22339 Hamburg
Deutschland

## Änderungen:

| Version: | Datum: | Autor: |
|----------|--------|--------|
| 1.0 | 17. März 2003 | A. Schnieber |
| 1.1 | 21. März 2003 | A. Schnieber |
| 1.2 | 27. März 2003 | A. Schnieber |
| 1.3 | 07. April 2003 | A.Schnieber/R.Krebs |
| 1.4 | 28. April 2003 | A.Schnieber/R.Krebs |

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Autor/Bearbeiter | Rahmenvertrag Sigma Six 2003-04-28 Final Dateiname | 28.04.2003 Änderungs-datum | 1 von 14 Seite |
|---|---|---|---|---|

© T-Systems

# ·· T··Systems·

## Inhaltsverzeichnis

I.   Allgemeine Bestimmungen ................................................................................................ 3
1    Vertragsgegenstand .................................................................................................... 3
2    Vertragsdokumente ..................................................................................................... 3
3    Schriftform .................................................................................................................... 4
4    Umfang der Leistung .................................................................................................... 4
5    Ausführung ................................................................................................................... 4
6    Allgemeine Mitwirkungspflichten TSI-CSU5 ............................................................... 4
7    Beizug von Subunternehmern und Unterlieferanten ................................................... 5
8    Verzug .......................................................................................................................... 5
9    Vergütung ..................................................................................................................... 5
10   Leistungsänderungen ................................................................................................... 6
11   Mängelrechte ................................................................................................................ 6
12   Haftung ......................................................................................................................... 7
13   Schutzrechte ................................................................................................................ 8
14   Erfüllungsort ................................................................................................................. 8
15   Geheimhaltung ............................................................................................................. 8
16   Personaleinsatz und Loyalitätsverpflichtung ............................................................... 9
II.  Besondere Bestimmungen für die Lieferung von Waren und Lizenzen ...................... 10
17   Gewährleistung ........................................................................................................... 10
18   Prüfung ....................................................................................................................... 10
19   Umfang der Lizenzrechte ............................................................................................ 10
IV.  Besondere Bestimmungen für die Erbringung von werkvertraglichen Leistungen .... 10
20   Gewährleistung ........................................................................................................... 11
21   Prüfung ....................................................................................................................... 11
IV.  Besondere Bestimmungen für die Erbringung von Wartungs- und Pflegeleistungen ... 12
22   Umfang von Wartung und Pflege ............................................................................... 12
23   Bereitschafts-, Reaktions- und Störungsbehebungszeit ........................................... 12
24   Dokumentation, Protokoll und Rapport ...................................................................... 12
25   Ausführung ................................................................................................................. 12
26   Updates und Releases ............................................................................................... 12
V.   Schlussbestimmungen ................................................................................................. 13
27   Vertragsdauer und Kündigung ................................................................................... 13
28   Abtretung, Übertragung und Verpfändung ................................................................. 13
29   Keine Partnerschaft .................................................................................................... 13
30   Salvatorische Klausel ................................................................................................. 13
31   Konfliktmanagement ................................................................................................... 14
32   Anwendbares Recht und Gerichtsstand ..................................................................... 14
33   Ausfertigung ............................................................................................................... 14

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Autor/Bearbeiter | Rahmenvertrag Sigma Six 2003-04-28 Final Dateiname | 28.04.2003 Änderungsdatum | 2 von 14 Seite |
|---|---|---|---|---|

© T-Systems

# · ·**T**· ·Systems·

## I.    Allgemeine Bestimmungen

### 1    Vertragsgegenstand

1.1    Ziel dieses Vertrages ist es, die Zusammenarbeit der Parteien im Bereich des Standardsoftwareproduktes ServiceNet zu regeln. Dieses Produkt wurde durch Sigma für T-Systems als Inventory Management System (IMS) entwickelt und soll im Rahmen von Projekten um weitere Komponenten des Servicemanagements zum Produkt ServiceNet erweitert werden.

1.2    Bei ServiceNet handelt es sich um eine nach state-of-the art Entwicklungsmethoden erstellte Standardsoftware für die Belange von Asset- und Servicemanagement, wie es von IT-Abteilungen von Unternehmen oder IT-Service Providern benötigt wird. ServiceNet ist mit aktuellen Microsoft-Entwicklungstools komponentenbasiert entwickelt worden.

1.3    TSI-CSU5 plant ServiceNet als Standard Service-Management Anwendung der T-Systems im SOP CDS Asset & Inventarisierung zu platzieren. Als erstes Projekt wurde hierzu die Implementierung von Service-Net im Customer Center Bahlsen für den Kunden Bahlsen ausgewählt.

1.4    TSI-CSU5 führt das Service Management für eine Reihe von Kunden im nördlichen und östlichen Teil Deutschlands durch, u.a. für Airbus, Axel Springer Verlag, Bahlsen, BAT, Deutsche See, Eurogate, Phönix, Total-Fina-Elf. Dies erfordert den Einsatz eines professionellen Standard-Tools zur Unterstützung des Service Managements.    Dieses professionelle Standard-Tool soll die Arbeitsabläufe des Service-Managements von TSI-CSU5 an der Schnittstelle zum Kunden unterstützen und ausgewählte Informationen über eine Weboberfläche auch den Kunden zur Verfügung stellen.

1.5    Sigma beabsichtigt, die Komplettbetreuung ServiceNet der TSI-CSU5, von Softwareverkauf über Anpassprogrammierung, Weiterentwicklung Einführungsunterstützung und Software-Wartung, durchzuführen. Der Betrieb erfolgt TSI-CSU5.

### 2    Vertragsdokumente

2.1    Dieser Rahmenvertrag regelt die Grundsätze der Zusammenarbeit.

2.2    Bestandteile dieses Vertrages sind:

- Dieser Rahmenvertrag
- Leistungsbeschreibung ( Anhang A )
- Terminplan ( Anhang B )
- Vergütungen ( Anhang C )
- Option Konzernlizenz ( Anhang D )

2.3    Jegliche Vertragsänderung erfordert die schriftliche Zustimmung beider Parteien.

2.4    Eine Änderung oder Ergänzung dieses Vertrages und seiner Anlagen ist ausschließlich schriftlich zulässig. Dies gilt auch für dieses Schriftformerfordernis.

2.5    Im Falle von Widersprüchen gilt folgende Reihenfolge:

- Anhänge, und zwar in der Prioritätenreihenfolge A – B – C - D, vor
- Rahmenvertrag

2.6    Allgemeinen Geschäftsbedingungen der Parteien sind ausgeschlossen.

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Autor/Bearbeiter | Rahmenvertrag Sigma Six 2003-04-28 Final Dateiname | 28.04.2003 Änderungsdatum | 3 von 14 Seite |
|---|---|---|---|---|

© T-Systems

T··Systems·

**3        Schriftform**

3.1      Lieferverträge (auch Bestellung und Annahme) und Lieferabrufe sowie Änderungen und Ergänzungen
werden ausschließlich schriftlich erteilt. Die Verwendung von Telefaxen ist der Schriftform gleichgesetzt.

**4        Umfang der Leistung**

4.1      Sigma erbringt für TSI-CSU5 die in den Anhängen spezifizierten Leistungen.

**5        Ausführung**

5.1      Sigma informiert TSI-CSU5 regelmäßig über den Fortschritt der Arbeiten und holt insbesondere alle erfor-
derlichen Vorgaben ein. Sigma zeigt TSI-CSU5 sofort alle Umstände an, welche die vertragsgemäße Erfül-
lung gefährden und informiert TSI-CSU5 außerdem über alle Weiterentwicklungen, die aus technischen
oder wirtschaftlichen Gründen eine Änderung der Leistungen angezeigt erscheinen lassen.

**6        Allgemeine Mitwirkungspflichten TSI-CSU5**

6.1      TSI-CSU5 gibt Sigma rechtzeitig alle für die Vertragserfüllung erforderlichen Vorgaben bekannt, namen-
lich die fachlichen Anforderungen im Rahmen der Erstellung der Pflichtenhefte. TSI-CSU5 wird sich be-
mühen, dass alle erforderlichen Mitwirkungspflichten rechtzeitig, im erforderlichen Umfang und für Sigma
unentgeltlich erbracht werden. Sollte es aus ausschließlich durch TSI-CSU5 zu vertretenden Gründen zu
Verzögerungen in Projekten kommen, so werden die fixierten Termine um den Verzögerungszeitraum
korrigiert.

6.2      Zu diesen Mitwirkungspflichten zählen unter anderem, dass TSI-CSU5:

   6.2.1   verpflichtet ist, einen qualifizierten Mitarbeiter am Erfüllungsort unterstützend zur Verfügung zu
           stellen;

   6.2.2   Sigma die notwendigen Zugänge zu seinen Räumlichkeiten, insbesondere Zugriff auf die
           Testsysteme, gewährt und gegebenenfalls die dafür nötigen Ermächtigungen von Dritten einholt;

   6.2.3   nach Absprache für die Stromversorgung und weitere Anschlüsse sorgt und wenn nötig ausrei-
           chende und zweckentsprechende Arbeitsräume einschließlich Arbeitsmittel sowie eine Möglich-
           keit zum Aufbewahren von Material zur Verfügung stellt;

   6.2.4   zu Gunsten der Mitarbeiter der Sigma dafür sorgt, dass er die Arbeitsschutzvorschriften einhält;

   6.2.5   Sigma jederzeit Zugang zu den für ihre Tätigkeiten notwendigen Informationen, namentlich zu
           den Systemdokumentationen und anderen systembezogenen Unterlagen, verschafft und sie
           rechtzeitig mit allen erforderlichen Informationen versorgt;

   6.2.6   für eine rechtzeitige Bereitstellung von Projektinformationen und Anforderungen zuhanden von
           Sigma sorgt;

   6.2.7   für ein zweckdienliches End-User-Training sorgt;

   6.2.8   die Produktivsysteme mit den entsprechenden Releases nachführt;

   6.2.9   einen Remote-Access-Zugang (z.B. via VPN) auf die Testsysteme für Sigma zur Verfügung stellt.

6.3      TSI-CSU5 wird für Sigma nach Abstimmung kostenlos als Referenzkunde das System in Hannover vorfüh-
ren und Sigma regelmäßig über die Erfahrungen berichten.

| T-Systems International GmbH, Ser-vice-Line CDS, CSU-5 | Andreas Schnieber Autor/Bearbeiter | Rahmenvertrag Sigma Six 2003-04-28 Final Dateiname | 28.04.2003 Änderungs-datum | 4 von 14 Seite |
|---|---|---|---|---|

© T-Systems

**· · T · · Systems ·**

**7      Beizug von Subunternehmern und Unterlieferanten**

7.1     Sigma darf Subunternehmer beiziehen, bleibt aber gegenüber TSI-CSU5 für das Erbringen der Leistungen verantwortlich.

7.2     Wenn TSI-CSU5 Sigma zum Beizug eines bestimmten Subunternehmers verpflichtet, wird Sigma von den Folgen etwaiger Nicht- oder Schlechterfüllungen des Subunternehmers durch T-Systems freigestellt.

**8      Verzug**

8.1     In den Anhängen genannte Liefertermine oder -fristen sind nur dann verbindlich, wenn diese von den Parteien ausdrücklich als verbindlich bezeichnet worden sind; andernfalls sind alle Termine/Fristen unverbindlich.

8.2     Ist die Nichteinhaltung einer Frist nachweislich auf Hindernisse zurückzuführen, die Sigma nicht zu vertreten hat, so wird die Frist angemessen verlängert.

**9      Vergütung**

9.1     Sigma erbringt die Leistungen zu den in den Anhängen verabredeten Festpreisen oder, falls ein Festpreis (Pauschalen) nicht vereinbart ist, nach Aufwand mit oberer Begrenzung der Vergütung (Kostendach).

9.2     Erbringt Sigma die Leistungen nach Aufwand, so liefert sie zusammen mit den Rechnungen einen Rapport. Er nennt pro Tag die Leistungen und den Aufwand jeder eingesetzten Person.

9.3     Soweit nichts Abweichendes vereinbart wurde, erfolgt die Rechnungsstellung:

   9.3.1   bei wiederkehrenden Vergütungen monatlich im Voraus;

   9.3.2   bei einmaligen Vergütungen entsprechend des vertraglich festgelegten Zahlungsplanes;

   9.3.3   bei Vergütungen nach Aufwand nach Erbringung der Leistung, jedoch mindestens am Ende jedes auf die Leistung folgenden Kalendermonates.

9.4     Jeglicher Einwand hinsichtlich der Rechnungen muss schriftlich nach Erhalt der Rechnung durch TSI-CSU5 bei Sigma eingehen. Die Reklamation umfasst den Umfang, die Art und die Gründe des Einwands.

9.5     Rechnungen sind innerhalb von 30 Tagen nach Eingang der Rechnung ohne Abzug zur Zahlung fällig. Davon abweichende Fälligkeitstermine werden im Zahlungsplan festgehalten. Eine verspätete Zahlung ist mit einem Prozent (1%) monatlich zu verzinsen.

9.6     Sigma kann zur Sicherstellung ihrer Forderung an den gelieferten Produkten sowie an etwaigen Ersatzlieferungen einen Eigentumsvorbehalt anbringen. Eigentumsvorbehalte sind in den Einzelverträgen zu regeln.

9.7     Bis zur vollständigen Bezahlung des (Teil-)Vertragswertes bleiben die gelieferten (Teil-)Produkte Eigentum von Sigma.

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Autor/Bearbeiter | Rahmenvertrag Sigma Six 2003-04-28 Final Dateiname | 28.04.2003 Änderungsdatum | 5 von 14 Seite |
| --- | --- | --- | --- | --- |

© T-Systems

T··Systems

**10    Leistungsänderungen**

10.1    Die Vertragspartner können jederzeit schriftlich Änderungen der vereinbarten Leistungen beantragen. Sind Auswirkungen auf Kosten oder Termine zu erwarten, sind die Leistungsänderungen TSI-CSU5 zu offerieren. Die Offerte umfasst alle wesentlichen Konsequenzen auf das Gesamtprojekt, namentlich bezüglich der Kosten und Termine. Sie enthält einen Hinweis, ob das Projekt bis zum Entscheid über die Vornahme der Änderung ganz oder teilweise unterbrochen werden sollte, und wie sich ein solcher Unterbruch auf die Vergütung und die Termine auswirken würde.

10.2    Bis zum Abschluss einer anders lautenden Vereinbarung setzt Sigma während der Prüfung von Änderungsvorschlägen ihre Arbeit vertragsgemäß fort.

10.3    Wesentliche Leistungsänderungen, welche Anpassungen von Vergütungen, Terminen und anderen Vertragspunkten nach sich ziehen, werden vor der Ausführung in einem Nachtrag zur Vertragsurkunde schriftlich festgehalten. Die Anpassung der Vergütung berechnet sich nach den Ansätzen im Zeitpunkt der Vereinbarung der Änderungen.

**11    Mängelrechte**

11.1    Liegt ein Mangel vor, kann TSI-CSU5 nach Wahl Nachbesserung, Ersatzlieferung, mängelfreie Ware oder einen dem Minderwert entsprechenden Abzug von der Vergütung verlangen.

11.2    Schlagen zwei Nachbesserungsversuche oder Ersatzlieferungen wegen desselben Mangels fehl, bleibt TSI-CSU5 das Recht vorbehalten, Herabsetzung oder nach seiner Wahl Rückgängigmachung des Vertrages zu verlangen.

11.3    Beruht ein Mangel auf der Fehlerhaftigkeit einer Leistung eines Zulieferers, beschränkt sich die Gewährleistung von Sigma zunächst auf die Abtretung der Gewährleistungsansprüche, die Sigma gegen den Zulieferer zustehen. Sofern der Zulieferer die Gewährleistung verweigert oder für TSI-CSU5 unzumutbar verzögert oder sofern der Zulieferer aus anderen Gründen zur Gewährleistung nicht in der Lage ist, richten sich die Gewährleistungsansprüche des TSI-CSU5 gegen Sigma.

11.4    Erfolgt die Nachbesserung pflichtgemäss, wird die einbehaltene Minderung an Sigma nachträglich ausgeschüttet.

11.5    Die Gewährleistung umfasst nicht die Beseitigung von Fehlern, die durch normalen Verschleiss, äussere Einflüsse oder Bedienungsfehler entstehen. Die Gewährleistung entfällt, soweit TSI-CSU5 ein nachweisliches Verschulden am Mangel trifft, insbesondere wenn TSI-CSU5 die Software selbst ändert oder durch Dritte ändern lässt.

11.6    Mängelrügen sind mit einer nachvollziehbaren Schilderung der Fehlersymptome schriftlich und, soweit möglich, unter Übergabe anzufertigender schriftlicher Aufzeichnungen, Hardkopien oder sonstiger die Mängel veranschaulichender Unterlagen zu erheben.

11.7    Die Mängelrechte verjähren nach sechs Monaten seit der Abnahme der Installation bzw. der Entgegennahme durch TSI-CSU5, wenn auf die Abnahme schriftlich verzichtet worden ist.

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Autor/Bearbeiter | Rahmenvertrag Sigma Six 2003-04-28 Final Dateiname | 28.04.2003 Änderungsdatum | 6 von 14 Seite |
| --- | --- | --- | --- | --- |

© T-Systems

**· · T · · Systems ·**

**12    Haftung**

12.1    Sigma haftet für direkte Personen- und Sachschäden, welche TSI-CSU5 im Zusammenhang mit der vertraglich vereinbarten Leistungserfüllung entstanden sind, im Falle von Vorsatz, grober Fahrlässigkeit und bei leichter Fahrlässigkeit für sogenennte Kardinalpflichten. Kardinalpflichten sind solche grundlegenden, vertragswesentlichen Pflichten, die maßgeblich für den Vertragsabschluss des Kunden waren und auf deren Einhaltung dieser vertrauen durfte.

12.2    Jede weitere Haftung, insbesondere für indirekte Schäden oder Folgeschäden wie entgangenen Gewinn, Mehraufwendungen, zusätzliche Personalkosten, nicht realisierte Einsparungen, Ansprüche Dritter oder Datenverlust sowie für Hilfspersonen und für Schäden aus verspäteter Leistung, etc., wird ausdrücklich ausgeschlossen, soweit dies gesetzlich zulässig ist.

12.3    Für Schäden, die auf eine vorsätzliche Vertragsverletzung des Auftragnehmers zurückzuführen sind, und für Schäden aus der Verletzung des Lebens, des Körpers und der Gesundheit haftet der Auftragnehmer unbegrenzt.

12.4    **Für Schäden, die auf eine grob fahrlässige Vertragsverletzung des Auftragnehmers zurückzuführen sind, ist die Haftung je Schadensereignis auf den bisherigen Gesamtumsatz aus diesem Vertrag begrenzt.**

12.5    In den Fällen leicht fahrlässiger Kardinalpflichtverletzung ist die Haftung je Schadensereignis bei Sachschäden und bei sonstigen Schäden, außerhalb von Schäden aus Verletzung des Lebens, des Körpers und der Gesundheit, auf den Gesamtumsatz für das jeweils vergangene Kalenderjahr begrenzt. Hierbei gilt bei Schäden bis zum 31.12. 2004 ein Mindestbetrag für die Haftungshöchstgrenze von EUR 100.000,- Ab dem 1.1.2005 gilt der Gesamtumsatz des jeweils vergangenen Kalenderjahres als Haftungshöchstgrenze.

12.6    Für Datenverlust im Verantwortungsbereich des Auftraggebers haftet der Auftragnehmer nur bis zur Höhe des typischen Wiederherstellungsaufwands, der bei täglicher Datensicherung entstanden wäre.

12.7    Sind mehrere Schäden auf das selbe schadensbegründende Ereignis zurückzuführen, so gelten alle Schäden zusammen im Sinne dieser Regelung als ein Schadensereignis.

12.8    Sigma haftet nicht für Schäden, die nachweislich auf Softwarefehler von Systemsoftware oder Computerviren zurückzuführen sind.

12.9    Sigma haftet nicht für Schäden, die nachweislich auf unsachgemässe Behandlung oder unerlaubte Benützung des Vertragsgegenstandes zurückzuführen sind.

12.10    Bei reiner Personalstellung haftet Sigma nur für die getreue und sorgfältige Auswahl (fachliche und persönliche Eignung) und allgemeine Instruktion der bei TSI-CSU5 eingesetzten Mitarbeiter oder Mitarbeiterinnen. Für die Richtigkeit und Zweckmässigkeit der erteilten Aufträge sowie die spezielle Instruktion, die Überwachung und Kontrolle der Leistungen ist TSI-CSU5 verantwortlich.

12.11    Ist für den Fall der Nicht- oder Schlechterfüllung einer vertraglichen Pflicht durch Sigma eine Konventionalstrafe vereinbart worden, sind mit ihrer Bezahlung sämtliche Schadenersatzansprüche TSI-CSU5 aufgrund der Nicht- oder Schlechterfüllung abgegolten.

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Autor/Bearbeiter | Rahmenvertrag Sigma Six 2003-04-28 Final Dateiname | 28.04.2003 Änderungsdatum | 7 von 14 Seite |
| --- | --- | --- | --- | --- |

© T-Systems

··T··Systems·

**13    Schutzrechte**

13.1   Alle bei der Vertragserfüllung entstandenen Schutzrechte (namentlich Urheber-, Patent-, Design- oder Markenrechte) an der von Sigma hergestellten Standardsoftware einschliesslich Quellencode und Programmbeschreibungen sowie das Eigentum an allen diesbezüglichen Dokumenten, Unterlagen oder Datenträgern stehen für den systemtechnischen Bereich ausschliesslich Sigma zu.

13.2   In jedem Fall verbleiben die Schutzrechte für die Inhalte, Prozesse und die Art der Anwendung ausschliesslich bei TSI-CSU5.

13.3   Sigma leistet Gewähr dafür, dass sie mit ihrem Angebot und ihren Leistungen keine Schutzrechte Dritter verletzt.

13.4   Sofern ein Produkt oder ein Teil desselben Gegenstand einer Klage wegen Verletzung von gewerblichen Schutzrechten ist oder nach der Meinung von Sigma werden könnte, kann Sigma TSI-CSU5 nach deren Wahl entweder das Recht verschaffen, den Gegenstand frei von jeder Haftung wegen Verletzung gewerblicher Schutzrechte zu benutzen, das Produkt durch ein anderes zu ersetzen, welches die wesentlichen vertraglichen Eigenschaften erfüllt, das Produkt so zu ergänzen, dass es keine Immaterialgüterrechte mehr verletzt, oder das Produkt zurückzunehmen und den Kaufpreis zurückerstatten.

13.5   TSI-CSU5 ist selbst verantwortlich für die Einhaltung der Lizenzvorschriften aller direkt durch ihn eingesetzten Softwareapplikationen, Software-Tools und Betriebssysteme.

**14    Erfüllungsort**

14.1   Erfüllungsort für die Leistungen der Sigma ist nach Wahl von TSI-CSU5 Hamburg oder Hannover.

14.2   Nutzen und Gefahr gehen mit der Ablieferung am Erfüllungsort bzw. bei Installation der Produkte durch Sigma am Tag nach der Abnahme auf TSI-CSU5 über.

**15    Geheimhaltung**

15.1   Die Vertragsparteien sind verpflichtet, die ihnen auf Grund dieses Rahmenvertrages und den im Rahmen dieses Rahmenvertrages zwischen ihnen abgeschlossenen Einzelverträgen von der jeweils anderen Partei zugänglich gemachten Informationen sowie Kenntnisse, die sie bei Gelegenheit dieser Zusammenarbeit über Angelegenheiten - etwa technischer, kommerzieller oder organisatorischer Art - der jeweils anderen Vertragspartei erlangen, vertraulich zu behandeln und während der Dauer sowie nach Beendigung dieses Rahmenvertrages und der in dessen Rahmen abgeschlossenen Einzelverträge nicht zu verwerten oder anderen zugänglich zu machen. Eine Nutzung dieser Information ist allein auf den Gebrauch im Rahmen dieser Zusammenarbeit beschränkt. Der Auftraggeber stellt insbesondere sicher, dass ein ihm überlassenes Angebot sowie Vertragsmuster und Individualverträge mit ihren jeweiligen Anlagen ohne vorherige Zustimmung des Auftragnehmers weder als Ganzes noch in Teilen Dritten bekannt wird, auch nicht in einer bearbeiteten Fassung.

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Autor/Bearbeiter | Rahmenvertrag Sigma Six 2003-04-28 Final Dateiname | 28.04.2003 Änderungs- datum | 8 von 14 Seite |
| --- | --- | --- | --- | --- |

© T-Systems

·· T ··Systems·

15.2    Diese Vertraulichkeitsverpflichtung gilt nicht für Informationen, die die andere Partei nachweislich

(a) von Dritten rechtmäßig erhalten hat oder erhält, oder die

(b) bei Vertragsabschluss bereits allgemein bekannt waren oder nachträglich ohne Verstoß gegen die in diesem Rahmenvertrag enthaltenen Verpflichtungen allgemein bekannt wurden, oder die

(c) von der zur Vertraulichkeit verpflichteten Vertragspartei unabhängig erarbeitet worden sind, oder

(d) für Techniken, Ideen, Knowhow und Konzeptionen eines Dritten (Dritt-Know-how), die dieser der anderen Vertragspartei rechtmäßig bekannt gemacht hat, auch soweit und soweit dieses Dritt-Know-how zufällig mit vertraulichen Informationen im Sinne dieses Abschnitts übereinstimmt.

(e) aufgrund zwingender gesetzlicher Regelungen offen zu legen sind.

15.3    Diese Vertraulichkeitsverpflichtungen gemäß vorstehender Abschnitte (1) und (2) bleiben für beide Vertragsparteien auch nach Beendigung dieses Rahmenvertrages bzw. der in dessen Rahmen abgeschlossenen Einzelverträge hinaus für weitere fünf Jahre ab dem Ende der Laufzeit des jeweiligen Vertrages bestehen.

## 16    Personaleinsatz und Loyalitätsverpflichtung

16.1    Die Vertragspartner geben schriftlich Name und Funktion der verantwortlichen Mitarbeiter (Steering Board-Mitglieder) bekannt. Sie setzen diese gemäss Projektorganisation ein.

16.2    Sigma gewährleistet, dass die unter diesem Vertrag eingesetzten bzw. entwickelten Tools nicht bei Wettbewerber von T-Systems vorgeführt, angeboten oder eingesetzt werden oder Informationen darüber an Wettbewerber von T-Systems weitergegeben werden. Sigma ist sich bewusst, dass eine Zuwiderhandlung zu einem erheblichen Schaden bei T-Systems führt. Sigma schuldet in diesem Fall TSI-CSU5 eine Konventionalstrafe, sofern Sigma nicht beweist, dass weder sie noch beauftragte Dritte ein Verschulden trifft. Diese beträgt je Fall mindestens € 50.000,– oder die Summe aller von T-Systems an Sigma entrichteter Vergütungen, je nach dem welcher Wert höher ist. Die Bezahlung der Konventionalstrafe befreit nicht von den Geheimhaltungspflichten, und Schadenersatzansprüche bleiben vorbehalten; die Konventionalstrafe wird jedoch auf den zu leistenden Schadenersatz angerechnet. Der Vertragspartner gegen dessen Geheimhaltungsinteresse verstossen wurde hat dem andren Vertragspartner die Quelle offen zu legen auf die er sich bzgl. der Geheimhaltungsverletzung beruft.

| T-Systems International GmbH, Ser-vice-Line CDS, CSU-5 | Andreas Schnieber Autor/Bearbeiter | Rahmenvertrag Sigma Six 2003-04-28 Final Dateiname | 28.04.2003 Änderungs-datum | 9 von 14 Seite |
|---|---|---|---|---|

© T-Systems

# ·T··Systems·

## II.   Besondere Bestimmungen für die Lieferung von Waren und Lizenzen

### 17   Gewährleistung

17.1   Sigma versichert nach bestem Wissen und Gewissen, dass ihre Produkte bei vertragsgemässem Einsatz die ausdrücklich zugesicherten Eigenschaften und Funktionen aufweisen und nicht mit Mängeln behaftet sind, die ihre Tauglichkeit aufheben oder erheblich einschränken.

### 18   Prüfung

18.1   TSI-CSU5 prüft den Kaufgegenstand (Version, Release) innerhalb 30 Tagen nach der Ablieferung. Die Installation zu Testzwecken bei neuen Accounts ist hier ausdrücklich ausgenommen. TSI-CSU5 zeigt der T-Systems festgestellte Mängel umgehend schriftlich an.

18.2   Mängel, welche bei der Prüfung nicht erkannt wurden, müssen nach ihrer Entdeckung Sigma innerhalb von 15 Tagen schriftlich angezeigt werden. Erfolgt die Anzeige zu einem späteren Zeitpunkt, so ist Sigma vom Ersatz etwaiger Schäden, die durch die Verzögerung entstanden sind, freigestellt.

### 19   Umfang der Lizenzrechte

19.1   TSI-CSU5 erhält das unbefristete, ausschliessliche Recht zum Gebrauch und zur Nutzung der Software in dem in den Anhängen umschriebenen Umfang auf der in den Anhängen bezeichneten Hardware und ihren Nachfolgesystemen.

19.2   TSI-CSU5 erhält durch diesen Vertrag kein Eigentum am Quellcode von ServiceNet.

19.3   Der Sourcecode von ServiceNet bleibt im ausschliesslichen Besitz und Eigentum von Sigma. Falls Sigma die Wartung oder die Weiterentwicklung von ServiceNet, aus welchen Gründen auch immer einstellt, erhält TSI-CSU5 den Anspruch auf Übermittlung des Sourcecodes. Für den Fall, dass Sigma diesen Vertrag aus wichtigem Grund kündigt und TSI-CSU5 auf Übertragung der Eigentumsrechte am Sourcecode besteht, geht an Sigma eine Vergütung in Höhe von € 250.000,–. Für den Fall, dass TSI-CSU5 diesen Vertrag aus wichtigem Grund oder Sigma diesen Vertrag fristgerecht kündigt, wird der Sourcecode kostenlos an TSI-CSU5 übertragen. Wenn Sigma einen anderen Partner für die Erbringung der vertraglichen Pflichten findet und dem TSI-CSU5 zugestimmt hat, so gilt die Beendigung der Leistungserbringung durch Sigma nicht als Kündigungsgrund aus wichtigem Grund.

19.4   Sind für TSI-CSU5 erkennbar Lizenzen von Dritten Teil der Leistungen von Sigma, anerkennt TSI-CSU5 zusätzlich die diesen Lizenzen zugehörigen Nutzungs- und Lizenzbedingungen dieser Dritten, soweit Sigma an TSI-CSU5 die entsprechenden Lizenzbedingungen vor der Nutzung durch TSI-CSU5 übergibt.

19.5   Die Beschaffung der nötigen Lizenzen aller zusätzlich notwendigen Systeme (Altiris, Intel, MS Sharepoint usw.) ist Sache von TSI-CSU5.

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Autor/Bearbeiter | Rahmenvertrag Sigma Six 2003-04-28 Final Dateiname | 28.04.2003 Änderungsdatum | 10 von 14 Seite |
|---|---|---|---|---|

© T-Systems

# ·‥T··Systems·

III. **Besondere Bestimmungen für die Erbringung von werkvertraglichen Leistungen**

**20    Gewährleistung**

20.1    Der Umfang der Gewährleistung richtet sich nach Ziffer 17.

**21    Prüfung**

21.1    Im Falle von werkvertraglichen Leistungen der Sigma erfolgt vor der Abnahme eine gemeinsame Prüfung.

21.2    Wenn nichts anderes vereinbart ist, erfolgt die Prüfung der Ergebnisse durch TSI-CSU5 innerhalb von 30 Tagen ab dem jeweiligen Stichtag gemäss Abnahmebereitschaftsmeldung oder ggfls. definierter Etappen, welcher auch immer später liegt. Über die Prüfung und deren Ergebnis wird ein Protokoll erstellt, das beide Parteien unterzeichnen. Im vertraglichen Rahmen sind auch Teilabnahmen möglich. Wird die Abnahme durch TSI-CSU5 über diese Frist hinaus verzögert und werden innerhalb der Frist keine Mängel schriftlich gerügt, so gilt die Abnahme als erfolgt.

21.3    Zeigen sich bei der Prüfung unerhebliche Mängel, so findet die Abnahme gleichwohl mit Abschluss der Prüfung statt. Sigma behebt die festgestellten Mängel unverzüglich und gibt deren Behebung TSI-CSU5 bekannt.

21.4    Zeigen sich bei der Prüfung erhebliche Mängel, so wird die Abnahme zurückgestellt. Sigma behebt umgehend die festgestellten Mängel und lädt TSI-CSU5 zu einer neuen Prüfung ein. Kann die Abnahme ein zweites Mal wegen dem gleichen Mangel nicht stattfinden, befindet sich Sigma im Verzug.

21.5    Erhebliche Mängel liegen vor, wenn die Produkte bei vertragsgemässem Einsatz die ausdrücklich zugesicherten Eigenschaften nicht aufweisen oder mit Mängeln behaftet sind, die ihre Tauglichkeit aufheben oder erheblich einschränken.

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Autor/Bearbeiter | Rahmenvertrag Sigma Six 2003-04-28 Final Dateiname | 28.04.2003 Änderungsdatum | 11 von 14 Seite |
| --- | --- | --- | --- | --- |

© T-Systems

## ·T··Systems·

### IV.   Besondere Bestimmungen für die Erbringung von Wartungs- und Pflege-leistungen

#### 22   Umfang von Wartung und Pflege

22.1   Die Pflege von Software umfasst die Beratung im Zusammenhang mit der Nutzung der Software, die Korrektur von Programmfehlern, die Anpassung und die Weiterentwicklung der Programme (neue Versionen, Releases). Funktionelle Erweiterungen können zusätzlich kostenpflichtig sein.

22.2   Sigma berät TSI-CSU5 bei Wartung und Pflege in angemessenem Umfang.

22.3   Sigma übernimmt die Feststellung von Fehlern der Software und die Beseitigung dieser Fehler, so dass die Software die im seinerzeitigen Lizenzvertrag zwischen Sigma und TSI-CSU5 vereinbarten Leistungen erbringt. Soweit Sigma nicht Lizenzgeber der Software ist, legen Sigma und TSI-CSU5 den Stand der Software bei Abschluss des Vertrages in Form eines Statusberichts fest, der die Grundlage für die spätere Feststellung eines Fehlers sein wird.

22.4   Hat sich beim Zusammenwirken mehrerer Systeme bzw. Komponenten ergeben, dass die Störung durch die von TSI-CSU5 betriebene Hardware verursacht worden sind, so werden die Leistungen separat verrechnet.

22.5   Umfang und Kosten für die Wartung und Pflege werden im einzelnen in den Anhängen beschrieben.

#### 23   Bereitschafts-, Reaktions- und Störungsbehebungszeit

23.1   Während der Bereitschaftszeit stellt Sigma TSI-CSU5 bezüglich Fehlermeldungen und funktionaler Fragen einen Support Desk für 3rd Level Support zur Verfügung.

23.2   Soweit nichts Abweichendes vereinbart, gilt als Bereitschaftszeit:

Montag bis Freitag von 0800 bis 1700 Uhr (ohne allgemeine Sonn- und Feiertage des Erfüllungsortes).

#### 24   Dokumentation, Protokoll und Rapport

24.1   Sigma stellt sicher, dass die erforderliche Dokumentation (englisch) nachgeführt wird und in einem Dokumentenmanagementsystem mit Versionsverwaltung abgelegt wird.

24.2   Sigma führt ein Wartungs- und Pflegeprotokoll und stellt es TSI-CSU5 auf Verlangen zur Verfügung.

#### 25   Ausführung

25.1   Sigma klärt TSI-CSU5 über Tatsachen und Umstände auf, welche Wartung und Pflege wesentlich erleichtern, verbilligen, erschweren oder gar verunmöglichen.

#### 26   Updates und Releases

26.1   Sigma stellt TSI-CSU5 gegen eine entsprechende Wartungsgebühr Anpassungen und Bugfixes (Patches) und die Weiterentwicklung (Version, Releases) der Programme (neue Versionen (1, 2, 3), Releases (2.4, 2.5), Patches (2.5.1, 2.5.2)) zu.

26.2   Die Softwarewartung erfolgt für die aktuelle Releaseversion und die letzte in der Vergangenheit. Unabhängig davon werden alle Releases mindestens 1 Jahr unter Softwarewartung gehalten.

26.3   Auf Verlangen des Kunden und gegen separate Vergütung umfasst die Pflege auch die notwendigen Anpassungen der Standardsoftware an von ihm geänderte Betriebs-, Datenbank- und Trägersysteme.

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Autor/Bearbeiter | Rahmenvertrag Sigma Six 2003-04-28 Final Dateiname | 28.04.2003 Änderungs-datum | 12 von 14 Seite |
|---|---|---|---|---|

© T-Systems

· · T· ·Systems·

## V.    Schlussbestimmungen

### 27    Vertragsdauer und Kündigung

27.1    Dieser Rahmenvertrag tritt mit der Unterzeichnung durch beide Parteien in Kraft.

27.2    Dieser Vertrag wird auf unbestimmte Zeit abgeschlossen und kann von jeder Partei unter Einhaltung einer dreimonatigen Kündigungsfrist jeweils zum Ende eines Kalendermonats gekündigt-werden.

27.3    Falls Sigma ihre vertraglichen Pflichten trotz zweimaliger schriftlicher Mahnung, je verbunden mit der Ansetzung einer angemessenen Nachfrist, in schwerwiegender und andauernder bzw. wiederholter Weise verletzt, kann TSI-CSU5 den Vertrag jederzeit aus wichtigem Grund zum Ende eines Kalendermonates auflösen. In einem solchen Fall ist die vereinbarte Vergütung pro rata bis zum Zeitpunkt geschuldet, in dem der Vertrag endet.

27.4    Sigma kann ihre Dienstleistungen einstellen oder beide Vertragspartner den Vertrag mit sofortiger Wirkung kündigen, falls wichtige Gründe vorliegen, namentlich wenn

27.4.1    TSI-CSU5 Dienstleistungen von Sigma für rechtswidrige Handlungen benützt und nach Aufforderung von Sigma diese rechtswidrigen Handlungen nicht unverzüglich beendet.

27.4.2    TSI-CSU5 zahlungsunfähig wird;

27.4.3    regulatorische oder gesetzliche Veränderungen in Kraft treten, welche die Tätigkeit von Sigma unmöglich machen.

### 28    Abtretung, Übertragung und Verpfändung

28.1    TSI-CSU5 darf Rechte und Pflichten aus dem Vertragsverhältnis nicht ohne vorherige schriftliche Zustimmung von Sigma an Dritte abtreten, übertragen oder verpfänden. Diese Zustimmung wird nicht ohne wichtigen Grund verweigert.

### 29    Keine Partnerschaft

29.1    Keine Bestimmung dieses Vertrags begründet eine Joint-Venture-Verbindung oder eine einfache Gesellschaft zwischen den Parteien oder macht eine Partei zum Vertreter der anderen Partei, zu welchem Zweck auch immer.

### 30    Salvatorische Klausel

30.1    Sollte eine Bestimmung dieses Vertrags ungültig oder nicht durchsetzbar sein, wird diese Ungültigkeit oder Nichtdurchsetzbarkeit die anderen Bestimmungen des Vertrags nicht ausser Kraft setzen oder undurchsetzbar machen. Die ungültige oder undurchsetzbare Bestimmung wird durch eine gültige Bestimmung ersetzt, welche dem wirtschaftlichen Zweck der ungültigen oder undurchsetzbaren Bestimmung so gut wie möglich gerecht wird.

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Autor/Bearbeiter | Rahmenvertrag Sigma Six 2003-04-28 Final Dateiname | 28.04.2003 Änderungs-datum | 13 von 14 Seite |
|---|---|---|---|---|

© T-Systems

# ·· T··Systems·

**31   Konfliktmanagement**

31.1   Im Falle von Uneinigkeiten bemühen sich die Parteien zunächst um eine gütliche Einigung. Das Differenzbereinigungsverfahren wird von beiden Vertragsparteien auf allen Ebenen nach dem Grundsatz von Treu und Glauben mit dem gemeinsamen Ziel der einvernehmlichen Bereinigung von Meinungs-differenzen durchgeführt.

31.2   Jede Partei ist berechtigt, Meinungsdifferenzen, die unter den Parteien aus dem Abschluss, der Durchführung oder der Beendigung dieses Vertrages samt aller Vertragsdokumente entstehen, der anderen Partei auf den im entsprechenden Anhang genannten Ebenen zur Bereinigung zu unterbreiten.

31.3   Jeder Ebene steht für die Lösung eines Konfliktes ein Zeitraum von 15 Arbeitstagen zur Verfügung. Kann innerhalb dieser Frist die Differenz nicht gelöst werden und nicht mindestens ein Bereinigungsplan vereinbart werden, so ist jede Partei berechtigt, die Meinungsdifferenz der nächsthöheren Ebene oder, nach dem Erreichen der höchsten Ebene, dem zuständigen Gericht zu unterbreiten.

**32   Anwendbares Recht und Gerichtsstand**

32.1   Im Übrigen ist auf das Vertragsverhältnis das Recht der Bundesrepublik Deutschland anwendbar.

32.2   Gerichtsstand ist Hamburg.

**33   Ausfertigung**

33.1   Die vorliegende Vertragsurkunde ist in zwei Exemplaren ausgefertigt. TSI-CSU5 und Sigma haben je ein unterzeichnetes Exemplar erhalten.

D-22339 Hamburg, _30. 6. 2003_          New York, NY 10280, _12/6/2003_
T-Systems International GmbH,            Sigma Six Consulting LLC
Service-Line CDS, Customer Service Unit 5

| T-Systems<br>International GmbH, Ser-<br>vice-Line CDS, CSU-5 | Andreas Schnieber<br>Autor/Bearbeiter | Rahmenvertrag Sigma Six<br>2003-04-28 Final<br>Dateiname | 28.04.2003<br>Änderungs-<br>datum | 14 von 14<br>Seite |
|---|---|---|---|---|

© T-Systems

# Framework Agreement

## for

## IT Services

between          Sigma Six Consulting LLC                      Sigma
                 200 Rector Place, Suite 8X
                 New York, NY 10280
                 USA


and              T-Systems International GmbH                  TSI-CSU5
                 Service Line CDS
                 Customer Service Unit 5
                 Lademannbogen 21-23
                 22339 Hamburg
                 Germany

Changes:

| Version: | Date: | Author: |
|---|---|---|
| 1.0 | March 17, 2003 | A. Schnieber |
| 1.1 | March 21, 2003 | A. Schnieber |
| 1.2 | March 27, 2003 | A. Schnieber |
| 1.3 | April 7, 2003 | A.Schnieber/R.Krebs |
| 1.4 | April 28, 2003 | A.Schnieber/R.Krebs |

# Table of Contents

I.    General Provisions..........................................................................................................3
   1    Subject of Contract...............................................................................................3
   2    Contractual Documents ........................................................................................3
   3    Written Form .........................................................................................................4
   4    Scope of Services ..................................................................................................4
   5    Execution...............................................................................................................4
   6    General Cooperation Obligations of TSI-CSU5....................................................4
   7    Use of Subcontractors and Subsuppliers ..............................................................4
   8    Delay .....................................................................................................................5
   9    Fees........................................................................................................................5
  10   Changes in Services...............................................................................................6
  11   Rights with respect to Defects...............................................................................6
  12   Liability .................................................................................................................7
  13   Intellectual Property Rights...................................................................................8
  14   Place of Performance.............................................................................................8
  15   Non-disclosure......................................................................................................8
  16   Personnel and Non-Disclosure ..............................................................................9
II. Special Provisions for the Supply of Goods and Licenses ...............................................10
  17   Warranty..............................................................................................................10
  18   Testing.................................................................................................................10
  19   Scope of Licensing Rights...................................................................................10
III. Special Provisions for Providing the Contractual Services ...........................................11
  20   Warranty..............................................................................................................11
  21   Testing.................................................................................................................11
IV.  Special Provisions for Supplying Maintenance and Servicing ......................................12
  22   Scope of Maintenance and Servicing ..................................................................12
  23   Service, Reaction and Correction Time................................................................12
  24   Documentation, Protocol and Report ...................................................................12
  25   Execution.............................................................................................................12
  26   Updates and Releases ..........................................................................................12
V.   Final Provisions ...........................................................................................................13
  27   Term and Termination of Contract.......................................................................13
  28   Assignment, Transfer and Pledge........................................................................13
  29   No Partnership......................................................................................................13
  30   Separability Clause..............................................................................................13
  31   Resolution of Conflicts........................................................................................14
  32   Applicable Law and Place of Jurisdiction ...........................................................14
  33   Copies..................................................................................................................14

# I.  General Provisions

## 1  Subject of Contract

The purpose of this agreement is to govern the cooperation of the Parties involving the standard software product ServiceNet. ServiceNet has been developed by Sigma for T-Systems as an Inventory Management System (IMS) and is to be expanded as part of projects to include additional service management components.

ServiceNet is a standard software package developed according to state-of-the art methods for the needs of asset and service management by IT departments of companies and IT service providers. ServiceNet has been developed based on components using current Microsoft development tools.

TSI-CSU5 plans to use ServiceNet as the standard service management application for T-Systems in SOP CDS Asset & Inventory. The Bahlsen Customer Center has been selected as the first customer site for the use of this application.

TSI-CSU5 performs service management for a number of customers in northern and eastern Germany, including Airbus, Axel Springer Verlag, Bahlsen, BAT, Deutsche See, Eurogate, Phönix and Total-Fina-Elf. This requires the use of a professional standard tool to support service management. The professional standard tool is intended to support the service management work processes by TSI-CSU5 at the customer interface as well as make selected information available to the customer on a Web platform.

Sigma intends to provide complete ServiceNet support for TSI-CSU5, from the sale of the software to customize it, further development, implementation support and software maintenance. Operation of ServiceNet is the responsibility of TSI-CSU5.

## 2  Contractual Documents

This Framework Agreement governs the principles of the collaboration of the Parties.

Components of this Agreement are :

- The Framework Agreement
- Scope of Services (Schedule A)
- Timetable (Schedule B)
- Fees (Schedule C)
- Group License Option (Schedule D)

All changes to this Agreement must be approved by both Parties in writing.

Changes or additions to this Agreement may be made exclusively in writing. The requirement that they be in writing may also only be changed in writing.

In case of contradictions, the following sequence applies:

- the Schedules, in the following order of priority A – B – C - D, followed by
- the Framework Agreement

The Standard Business Conditions of the Parties are excluded.

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Author/Contact | Rahmenvertrag Sigma Six 2003-04-28 Final File name | 28.04.2003 Change date | 3  of 14 Page |
|---|---|---|---|---|

3      Written Form

The contracts to deliver (including order and acceptance) and the calls for delivery as well as changes and additions are issued exclusively in writing. The use of faxes is equivalent to written form.


4      Scope of Services

Sigma provides the services for TSI-CSU5 specified in the Schedules.


5      Execution

Sigma informs TSI-CSU5 regularly of the progress of the work and in particular obtains all necessary guidelines. Sigma immediately reports to TSI-CSU5 any circumstances that jeopardize contractual performance and also informs TSI-CSU5 of any further developments that make a change in the services seem appropriate for technical or commercial reasons.


6      General Cooperation Obligations of TSI-CSU5

TSI-CSU5 will promptly notify Sigma of all guidelines necessary for performance of the Agreement, specifically technical requirements as part of the preparation of the technical specifications. TSI-CSU5 will make efforts to ensure that all cooperation obligations are fulfilled promptly, to the required extent and at no cost to Sigma. If delays in projects should occur exclusively for reasons due to TSI-CSU5, the deadlines will be adjusted to reflect the length of the delay.

Included among the cooperation obligations of TSI-CSU5 is that it will:

6.1.1    make a qualified employee available for support purposes at the place of performance;

6.1.2    allow Sigma the necessary access to its premises, in particular access to test systems and, where necessary, obtain the required permission from third parties;

6.1.3    after consultation, arrange for the electricity supply and additional connections and, if necessary, provide adequate and functional workrooms as well as adequate facilities for storing equipment;

6.1.4    ensure compliance with occupational safety regulations on behalf of Sigma employees;

6.1.5    allow Sigma access at any time to the information necessary for its activities, specifically to system documentation and other system-related documentation, and promptly provide all required information;

6.1.6    ensure the prompt availability of project information and requirements for Sigma;

6.1.7    provide functional end-user training;

6.1.8    keep the production system up-to-date with corresponding releases;

6.1.9    make remote access (e.g. via VPN) to the test systems available to Sigma.


TSI-CSU5, after agreement, will demonstrate the system in Hanover at no cost to Sigma as a reference customer and will report to Sigma regularly on its experience.


7      Use of Subcontractors and Subsuppliers

Sigma may use subcontractors but remains responsible to TSI-CSU5 for the performance of the services.

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Author/Contact | Rahmenvertrag Sigma Six 2003-04-28 Final File name | 28.04.2003 Change date | 4  of 14 Page |
|---|---|---|---|---|

If TSI-CSU5 requires Sigma to use a specific subcontractor, Sigma is indemnified for the consequences of any missing or poor performance by the subcontractor selected by T-Systems.

## 8    Delay

The delivery deadlines or periods listed in the Schedules are binding only if they are expressly described as binding by the Parties; otherwise, all deadlines/periods are not binding.

If failure to respect a deadline can be proven to be due to obstacles for which Sigma is not responsible, the deadline is extended as appropriate.

## 9    Fees

Sigma provides the services at the fixed prices agreed to in the Schedules or, if no fixed price (lump sum) has been agreed to, at cost, with an upper limit on the fees (cost ceiling).

If Sigma provides the services at cost, it will include a listing the services and expenses of each person used per day in its invoices.

If not otherwise arranged, the invoicing occurs as follows:

9.1.1    for recurring fees, monthly in advance;

9.1.2    for one-time fees, in accordance with the contractually agreed payment schedule;

9.1.3    for fees at cost after delivery of the service, at least at the end of each calendar month following the service.

Any objection to the invoices must be sent to Sigma in writing after receipt of the invoice by TSI-CSU5. The claim includes the scope, nature and reasons for the objection.

Invoices are payable within 30 days of receipt of the invoice with no discount. Any differing payable dates are stated in the payment schedule.  Late payments are charged one percent (1%) interest monthly.

To guarantee its claim, Sigma can apply a reservation of title to the delivered products as well as to any replacement deliveries. The reservations of title are governed by the individual contracts.

Until the complete payment of the (partial) contract value, the delivered (partial) products are the property of Sigma.

10      Changes in Services

10.1    The contracting partners may seek changes in the agreed-upon services at any time in writing.  If impacts on costs or schedules can be expected, the changes in services are to be proposed to TSI-CSU5. This proposal includes all material consequences for the overall project, specifically with reference to costs and schedules.  It contains information as to whether the project should be interrupted in part or entirely until a decision is reached on making the changes and how such an interruption would affect the fees and the schedules.

10.2    Unless arranged otherwise in another agreement, Sigma will continue its work according to the contract while the proposed changes are being reviewed.

10.3    Material changes in the deliverables that would require adjustments in fees, schedules or other aspects of the agreement are set out in writing in a supplement to the Agreement before they are executed.  The fee adjustment is calculated using the estimates made at the time that the changes are agreed to.

11      Rights with respect to Defects

11.1    If there is a defect, TSI-CSU5 can choose rectification, substitute delivery, products free of defect or a deduction in the remuneration reflecting the reduction in value.

11.2    If two attempts at rectification or substitute delivery are unsuccessful because of the same defect, TSI-CSU5 retains the right to require an abatement or, at its discretion, rescission of the Agreement.

11.3    If a defect is due to the defective work of a supplier, the warranty offered by Sigma is initially limited to assigning its right to warranty claims with respect to the supplier.  If the supplier refuses to respect the warranty or delays for a period that is unacceptable to TSI-CSU5 or for other reasons is unable to respect the warranty, warranty claims by TSI-CSU5 are applied to Sigma.

11.4    If the rectification occurs as required, any holdback is retroactively paid to Sigma.

11.5    The warranty does not include the elimination of defects that arise from normal wear and tear, outside influences or errors in use.  The warranty is not applicable to the extent that TSI-CSU5 can be proven to have responsibility for the defect, especially if TSI-CSU5 itself modifies the software or has it modified by third parties.

11.6    Complaints are to be made in writing with a comprehensible description of the symptoms of the defect and to the extent possible, with submission of written notes, hard copies or other materials that make the defects easier to understand.

11.7    Defects are time-barred six months after acceptance of the installation or receipt of its delivery by TSI-CSU5, if acceptance has been waived in writing.

12      Liability

12.1    Sigma is liable for direct damage to persons or property which occur to TSI-CSU5 in connection with performance of the contractually agreed-to services, in case of intentional harm, gross negligence or, in case of slight negligence, breach of the so-called cardinal obligations. Cardinal obligations are the essential and material obligations that were decisive in the execution of the contract by the customer and on whose fulfillment the customer may reasonably rely.

12.2    Any additional liability, in particular for indirect damage or consequential damage, such as lost revenues, additional expenses, additional personnel expenses, savings not achieved, claims by third parties or loss of data as well as for auxiliary personnel and damage from delayed performance, etc. is explicitly excluded where such exclusion is allowed by law.

12.3    There is no limit to the liability of the contractor in regard to damage due to an intentional breach of the Agreement by the contractor or from injury to life, body or health.

12.4    For damage that is due to grossly negligent breach of contract by the contractor, the liability per claim is limited to the total sale under this Agreement at that point.

12.5    In cases of slightly negligent breach of the cardinal obligations, the liability per claim in property damage and other damage other than injury to life, body or health is limited the total sale for the current calendar year. In this respect, for damage until December 31, 2004, the minimum amount for the ceiling on liability is €100,000. From January 1, 2005 the total sales in the current calendar year are considered the ceiling on liability.

12.6    For loss of data in the principal's area of responsibility, the contractor is liable only for the amount of the typical recovery expense if there is a daily data backup.

12.7    If several claims are due to the same event, all claims together are considered one claim as defined here.

12.8    Sigma is not liable for damage that is provably due to software errors in system software or computer viruses.

12.9    Sigma is not liable for damage that is provably due to inappropriate treatment or unauthorized use of the subject of this Agreement.

12.10   When merely providing personnel, Sigma is liable only for faithful and careful selection (for technical and personal suitability) and the general training of the employees assigned to TSI-CSU5. TSI-CSU5 is responsible for the accuracy and functionality of the assignments given and special training, monitoring and supervision of performance.

12.11   If a contract penalty has been negotiated in case of the non-performance or inadequate performance of a contractual obligation by Sigma, its payment includes all claims for damages by TSI-CSU5 based on non- or poor performance.

13      Intellectual Property Rights

13.1    All intellectual property rights that result from the performance of the Agreement (specifically copyright, patents, design or trade marks) for standard software developed by Sigma, including source code and program descriptions as well as ownership of all related documents, records or data media, belong exclusively to Sigma with regard to their technical aspects.

13.2    In every case, the intellectual property rights for the content, processes and type of application remain exclusively with TSI-CSU5.

13.3    Sigma warrants that it does not violate the property rights of any third parties with its offering or its services.

13.4    Where a product or a portion of one is or could be in the opinion of Sigma the object of a complaint for infringement of commercial intellectual rights, Sigma can at its discretion allow TSI-CSU5 either the right to use the object free of liability for infringement of intellectual property rights or replace it with another which performs the essential contractual characteristics, supplement the product such that it no longer violates intangible property rights or withdraw the product and refund the purchase price.

13.5    TSI-CSU5 is itself responsible for respecting the licensing requirements of all the software applications, software tools and operating systems it uses directly.


14      Place of Performance

14.1    Place of performance for the services of Sigma is Hamburg or Hanover, at the discretion of TSI-CSU5.

14.2    Benefits and risks are transferred to TSI-CSU5 upon delivery of the products by Sigma to the place of performance or installation as of the day after acceptance.


15      Non-disclosure

15.1    The contracting parties are obliged to keep confidential the information made accessible to them by the other Party on the basis of this Framework Agreement and any individual contracts between them executed, in each case, on the basis of this Framework Agreement, as well as not to exploit or make accessible to others any knowledge about the other Party acquired as part of their cooperation – whether technical, commercial or organizational – during the term and after the termination of this Framework Agreement and the individual agreements executed as part of it. Such information can be used solely as part of the cooperation between them. The client specifically guarantees that the offering, contract sample and individual contracts with their respective schedules will not be made known in whole or in part to third parties, not even in a revised version.

15.2   This non-disclosure obligation does not apply to information which the other party can prove

(a) it has obtained legally from third parties, or

(b) was already generally known at the time of the execution of the Agreement or later became generally known without any violation of the obligations contained in this Framework Agreement, or

(c) it was obtained independent of the party obliged to non-disclosure, or

(d) involves techniques, ideas, know-how and concepts of a third party (third-party know-how), which this party had legally made known to the other contracting party, even if this third-party know-how coincidentally corresponds to confidential information in the meaning of this section,

(e) to have to disclose it on the basis of prevailing legal provisions.

15.3   These non-disclosure obligations under the preceding subsections (1) and (2) remain in force for both contracting parties after the end of this Framework Agreement or the individual agreements reached under this framework for an additional five years from the end of each of the individual agreements.

16     Personnel and Non-Disclosure

16.1   The contracting partners give in writing the name and duties of the responsible employees (Steering Board members), who are assigned duties in accordance with the project organization.

16.2   Sigma warrants that the tools used under this Agreement or developed for it have not been demonstrated, offered or used by competitors of T-Systems nor has information on them been transferred to competitors of T-Systems. Sigma is aware that violation of this provision would lead to substantial damage for T-Systems. In this case, Sigma would owe TSI-CSU5 a contractual penalty if Sigma cannot show that neither it nor authorized third parties are responsible. This penalty amounts in each instance to at least € 50,000,-- or the total of all fees paid by T-Systems to Sigma, whichever is higher. The payment of the contract penalty does not waive the non-disclosure obligations, and claims for damages are reserved; the contract penalty is however included in any damages to be paid. The contracting party whose non-disclosure interest was violated must reveal to the other contracting party the source of its claim that confidentiality has been violated.

## II. Special Provisions for the Supply of Goods and Licenses

17      Warranty

17.1    Sigma warrants, according to the best of its knowledge, that its products, when used in accordance with the Agreement, have the explicitly promised characteristics and functions and do not have defects that make them unusable or substantially limit their suitability.

18      Testing

18.1    TSI-CSU5 tests the purchased object (Version, Release) within 30 days of delivery. Installation for testing purposes with new accounts is expressly excluded.  TSI-CSU5 reports any defects noted by T-Systems in writing.

18.2    Defects that are not recognized during testing must be reported in writing to Sigma within 15 days.  If the report occurs at a later date, Sigma is not liable for compensation for any damages resulting from the delay.

19      Scope of Licensing Rights

19.1    TSI-CSU5 receives the unlimited, exclusive right to use and run the software in the scope described in the Schedules on the hardware and subsequent systems listed in the Schedules.

19.2    TSI-CSU5 does not receive any title to the source code of ServiceNet under this Agreement.

19.3    The source code of ServiceNet remains the exclusive property of Sigma. If Sigma stops maintenance or further development of ServiceNet for any reason, TSI-CSU5 has a claim to receive the source code.  If Sigma terminates this Agreement for cause and TSI-CSU5 insists on the transfer of the title to the source code, Sigma will be paid compensation amounting to € 250,000,--. If TSI-CSU5 terminates this agreement for cause or Sigma terminates it within the time provided in the contract, the source code is transferred to TSI-CSU5 at no cost. If Sigma finds another partner to fulfill the contractual obligations and TSI-CSU5 has agreed, termination of the supply of services by Sigma is not considered a compelling reason for termination.

19.4    If for TSI-CSU5 licenses by Third Parties are recognizably part of the services of Sigma, TSI-CSU5 additionally acknowledges the use and licensing conditions of these third parties, to the extent that Sigma transfers to TSI-CSU5 the corresponding licensing conditions before their use by TSI-CSU5.

19.5    Obtaining the required licenses to all additionally necessary systems, (Altiris, Intel, MS Sharepoint etc.) is the responsibility of TSI-CSU5.

# III. Special Provisions for Providing the Contractual Services

**20      Warranty**

20.1     The scope of the warranty is governed by 17 above.


**21      Testing**

21.1     In the case of the contractual services of Sigma, a joint test is conducted before acceptance.

21.2     If nothing is arranged otherwise, the testing of the results by TSI-CSU5 occurs within 30 days af-
ter the reference date specified in the acceptance readiness report or in any defined steps, which-
ever is later. A record is made of the testing and its results and it is signed by both parties.   The
contractual framework also allows partial acceptances.  If the acceptance is delayed by TSI-CSU5
beyond this deadline and no complaints are made within the period, acceptance is deemed to have
occurred.

21.3     If minor defects are found in the testing, acceptance takes place anyway upon conclusion of the
testing.  Sigma immediately fixes any defects noted and so informs TSI-CSU5.

21.4     If substantial defects are detected in the testing, acceptance is postponed.  Sigma eliminates the
defects noted and invites TSI-CSU5 to a new test.  If acceptance cannot occur a second time be-
cause of the same defect, Sigma is in default.

21.5     Substantial defects are present if when the products are used according to the agreement, they not
have the characteristics explicitly promised or have defects that cancel or substantially reduce
their suitability.

# IV. Special Provisions for Supplying Maintenance and Servicing

22      Scope of Maintenance and Servicing

22.1    Servicing of software includes consulting in connection with the use of the software, correction of program errors, adaptation and further development of the programs (new versions, releases). Functional expansions may require additional payments.

22.2    Sigma advises TSI-CSU5 on maintenance and servicing as appropriate.

22.3    Sigma is responsible for detecting software errors and correcting them so that the software in the licensing agreement between Sigma and TSI-CSU5 performs as agreed. If Sigma is not the licensor of the software, Sigma and TSI-CSU5 define the status of the software when the contract is executed in the form of a status report which is the basis for the later identification of errors.

22.4    If it appears from the joint action of several systems or components that problems are caused by the hardware used by TSI-CSU5, the services are billed separately.

22.5    Scope and cost for maintenance and servicing are described individually in the Schedules.


23      Service, Reaction and Correction Time

23.1    During the service time, Sigma TSI-CSU5 makes a 3rd level support desk available for error reports and functional questions.

23.2    Where not otherwise agreed, the service time is:

Monday to Friday from 8 a.m. to 5 p.m. (excluding Sundays and general holidays at the place of performance).


24      Documentation, Protocol and Report

24.1    Sigma makes sure that the required documentation (in English) is maintained and stored in a document management system with version administration.

24.2    Sigma prepares a maintenance and service protocol and makes it available to TSI-CSU5 upon request.


25      Execution

25.1    Sigma notifies TSI-CSU5 of any facts and circumstances that would make maintenance and servicing substantially simpler, cheaper, more difficult or impossible.


26      Updates and Releases

26.1    Sigma delivers to TSI-CSU5, for a corresponding servicing fee, adaptations and bug fixes (patches) and further developments (versions, releases) of the programs (new versions (1, 2, 3), releases (2.4, 2.5), patches (2.5.1, 2.5.2)).

26.2    Software maintenance is provided for the current release and the most recent past version. In any case, all releases receive software maintenance for at least 1 year.

26.3    At the request of the customer and in return for separate remuneration, the servicing also includes the necessary adaptation of standard software to its modified operating, database and media systems.

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Author/Contact | Rahmenvertrag Sigma Six 2003-04-28 Final File name | 28.04.2003 Change date | 12 of 14 Page |
|---|---|---|---|---|

## V. Final Provisions

27    Term and Termination of Contract

27.1    This Framework Agreement comes into force when signed by both Parties.

27.2    This Agreement is for an indefinite period and can be terminated by either Party with three months' notice at the end of each calendar year.

27.3    If Sigma defaults on its contractual obligations in a material and persistent or repeated way, in spite of two written warnings, each containing an appropriate deadline for response, TSI-CSU5 can dissolve the agreement at any time for cause at the end of a calendar month. In such an event, the agreed-upon fee is owed pro-rated to when the contract ends.

27.4    Sigma can stop its services or both contracting parties can terminate the agreement without notice if there are compelling reasons, specifically if

27.4.1    TSI-CSU5 uses services from Sigma for illegal actions and fails to immediately stop doing so even after being so requested by Sigma;

27.4.2    TSI-CSU5 become insolvent;

27.4.3    regulatory or legal changes take effect that make Sigma's activity impossible.

28    Assignment, Transfer and Pledge

28.1    TSI-CSU5 may not assign, transfer or pledge rights and obligations under this agreement to third parties without the prior written consent of Sigma. Such consent will not be refused without a compelling reason.

29    No Partnership

29.1    No provision of this Agreement creates a Joint Venture relationship or simple partnership between the parties or makes one party the representative of the other for any purpose.

30    Separability Clause

30.1    If one provision of this agreement is invalid or unenforceable, this invalidity or unenforceability does not make the other provisions of this agreement invalid or unenforceable. The invalid or unenforceable provision is replaced by a valid one that comes as close as possible to the commercial purpose of the invalid or unenforceable provision.

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Author/Contact | Rahmenvertrag Sigma Six 2003-04-28 Final File name | 28.04.2003 Change date | 13 of 14 Page |
|---|---|---|---|---|

31   Resolution of Conflicts

31.1   In case of disagreements, the Parties will first seek an amicable resolution. The dispute resolution process is executed by both parties at all levels according to the principle of good faith with the common goal of the mutual settlement of their differences of opinion.

31.2   Each Party is entitled to make a proposal for resolving the disagreement for differences of opinion that arise between the parties from the execution, performance or termination of this Agreement, including all contractual documents to the other Party at the level listed in the appropriate Schedule for resolving differences.

31.3   Each level has a period of 15 business days for the solution of a conflict. If the difference cannot be resolved within this period and a resolution plan has not at least been arranged, each Party is entitled to bring the difference of opinion to the next highest level, or after reaching the highest level, to the court with jurisdiction.

32   Applicable Law and Place of Jurisdiction

32.1   The law of the Federal Republic of Germany applies to the contractual relationship.

32.2   Court of Jurisdiction is Hamburg.

33   Copies

33.1   This document has been prepared in two originals. TSI-CSU5 and Sigma have each received one signed copy.

D-22339 Hamburg, ..*30-06-2003*                    .   New York, NY 10280, .*12/6/2003*
T-Systems International GmbH,                           Sigma Six Consulting LLC
Service-Line CDS, Customer Service Unit 5

[signed]_____        [signed]_____        [signed]_____        _____

_____        _____        _____        _____

| T-Systems International GmbH, Service-Line CDS, CSU-5 | Andreas Schnieber Author/Contact | Rahmenvertrag Sigma Six 2003-04-28 Final File name | 28.04.2003 Change date | 14  of 14 Page |
|---|---|---|---|---|

# Exhibit B

## DEVELOPMENT AND CONSULTING AGREEMENT

THIS DEVELOPMENT AND CONSULTING AGREEMENT ("Agreement") effective as of December 1, 2001 ("Effective Date") is between Sigma Six Technologies, Inc., a New York corporation with offices at 118 East 28th Street, Suite 901, New York NY 10016 USA ("Sigma") and Nagarro Inc., a corporation existing under the laws of the State of New Jersey with offices at 1790A Technology Drive, San Jose CA 95110 USA , including all subsidiaries and affiliates of Nagarro, Inc., including without limitation, the subsidiary with a business address of Nagarro Software Private Limited, 3 B - Electronic City, Sector 18, Gurgaon - 122015, Haryana, India, (collectively, "Consulting Company").

In consideration of the mutual promises set forth herein, Sigma and Consulting Company hereby agree as follows:

1.  SERVICES  Consulting Company agrees to provide to Sigma consulting services ("Consulting Services") as described on Schedule A in the form attached hereto and made a part hereof in consideration for the fees described therein. Upon the express prior written consent of the parties, such Schedule A may be amended and supplemented from time to time in accordance with the terms of this Agreement.

2.  CONSULTING COMPANY PERSONNEL

2.1.  Consulting Company Staff. Consulting Company will provide adequate staff to complete the services specified in the Schedule within the time frames and with the skills as set forth in Schedule A. Consulting Company agrees to make every reasonable effort to ensure the continuity of Consulting Company employees assigned to perform services hereunder. Any change in the team will be communicated to Sigma at least 2 weeks in advance, and Consulting Company will make every effort to make the transition as smooth as possible. In the event Consulting Company replaces any personnel assigned to perform the services, Consulting Company will provide a replacement acceptable to Sigma as soon thereafter as is reasonably possible. If Sigma advises that any of the personnel assigned to the Agreement are in any respect unsatisfactory including where any such personnel, are expected to be or have been absent for any period, then Consulting Company shall supply a replacement or substitution of equivalent caliber and experience. There will be no charge to Sigma for any replacement personnel assigned by Consulting Company until Sigma and Consulting Company agree that each such replacement has acquired the necessary orientation and background to make a productive contribution. Any such replacement or substitution shall be at no more than the rate specified herein, or otherwise agreed in writing by Sigma and shall be without disruption to the delivery of the services to Sigma. Any holidays to be taken or other planned absences of more than 3 (three) Working Days by Consulting Company's personnel shall be agreed in advance by Sigma.



1

2.2   Independent Contractor. Consulting Company is acting, in performance of this Agreement, as an independent contractor. Personnel supplied by Consulting Company hereunder are not Sigma's employees or agents and Consulting Company assumes full responsibility for their acts, and agrees not to represent itself or its employees as employees of Sigma. Consulting Company shall be solely responsible for the payment of compensation of Consulting Company's employees assigned to perform services hereunder and such employees shall be informed that they are not entitled to the provision of any Sigma employee benefits. Sigma shall not be responsible for payment of worker's compensation, disability benefits, and unemployment insurance or for withholding or paying employment related taxes for any Consulting Company employee, but such responsibility shall be solely that of Consulting Company. The use of sub-contractor shall not discharge Consulting Company from any of its obligations hereunder and Consulting Company shall be responsible for and liable in respect of all acts and defaults of the sub-contractor. Any such subcontract or assignment shall include the applicable obligations of such sub-contractor as specified in this Agreement with respect to the Consulting Company.

3.    PROJECT MANAGEMENT Consulting Company shall submit a detailed written progress report to Sigma periodically, as requested by Sigma, during the term of the Agreement. Such progress reports will detail the current status of Consulting Company activities, indicate the progress of the work being performed and resources expended since the last report, as well as provide a cumulative total to date, and identify actual and anticipated problem areas, the impact thereof on Consulting Company's work effort, and action being taken or alternative actions to be taken to remedy such problems. At the end of each calendar month during the term of this Agreement, Consulting Company shall provide Sigma with all Source Code relating to the services performed under this Agreement, by way of a simple upload to Sigma's ftp site.

4.    FEES, EXPENSES, RECORDS AND TAXES

4.1.  Fees. Consulting Company agrees to invoice Sigma, monthly in arrears, for services provided to Sigma by Consulting Company as described in Schedule A. Sigma shall pay such invoices within thirty (30) days after receipt. Company shall ensure that each of its personnel complete, on a weekly basis timesheets in an electronic form as required by Sigma.

4.2.  Expenses. In addition, Consulting Company shall invoice Sigma, monthly in arrears, for expenses incurred as described in Schedule A. Such expenses shall be limited to reasonable out-of-pocket expenses necessarily and actually incurred by Consulting Company in the performance of its services hereunder, provided that: (i) Sigma has given its prior written consent for any such expenses in excess of $500; and (ii) if requested by Sigma, Consulting Company has submitted supporting documentation in addition to the approved expense form.



2

5.    INDEMNITY

5.1    Indemnity.  Consulting Company agrees to indemnify, defend and hold Sigma harmless at Consulting Company's own cost and expense any claim or action against Sigma, its affiliated companies (the "Sigma Companies") and their directors, officers, employees, clients, agents, subcontractors (other than consulting business guests and business visitors) collectively with the Sigma Companies the "Indemnified Parties", for actual or alleged infringement of any third party's contractual, industrial, commercial or intellectual property rights (including, but not limited to, misappropriation of trade secrets) based on any software, program, service and/or other materials furnished to Sigma by Consulting Company pursuant to the terms of this Agreement or the use thereof by Sigma.  Sigma shall use its reasonable endeavors to give Consulting Company the earliest possible notice in writing of any claims, actions or proceedings being made, threatened or brought against Sigma.  Without limiting or reducing Sigma's rights herein, in the event that infringement of rights as aforesaid prevents Sigma from having the full beneficial use of any deliverable Consulting Company shall forthwith either:   (i) procure for Sigma and/or its assignee, the right to continue the use of such deliverables and any associated documentation; or (ii) replace or modify the same so that it becomes non-infringing, (provided nevertheless that any replacement or modification shall not materially prejudice Sigma beneficial use of such deliverables or cause it no longer to comply with the Schedule and that such replacement or modification will be carried out forthwith so as to avoid or reduce so far as possible any interruption in Sigma business operations). Consulting Company shall give Sigma the earliest possible notice in writing of any such claims, actions or proceedings being made, threatened or brought against Consulting Company in respect of any deliverables or which otherwise relates to this Agreement.  The provisions of Article 5 shall survive termination of this Agreement.

6.    CONFIDENTIALITY AND PROPRIETARY RIGHTS

6.1.    Confidentiality.

In the course of its services hereunder, Consulting Company may obtain access to, or learn, Confidential Information of Sigma.  For purposes of this Agreement, "Confidential Information" shall include, but not be limited to, information concerning Sigma's operations, products, customers, trade secrets, data processing systems and components, formulae, processes, research, cost data, mechanisms of activity, technical know-how, pricing, software programs (including source code), business plans, personnel, projects in process, finances or any other information designated by Sigma in writing as Confidential Information, or otherwise subject to reasonable efforts to maintain the secrecy thereof.  Consulting Company shall not disclose to any third party, or allow any third party to examine, copy or learn of, any Confidential Information without the express written consent of the Sigma, and Consulting Company shall not use any Confidential Information except as required in the course of providing the services hereunder.  Without limiting any rights of Sigma under this Agreement, Consulting Company hereby agrees that it



3

shall not disclose to any third party the existence or terms of this Agreement, any work performed for Sigma hereunder, or any client's of Sigma. Consulting Company shall, in advance, require each employee or subcontractor assigned to perform services under any Schedule and each employee or subcontractor who obtains or is in a position to obtain any Sigma information or materials, to execute Sigma's standard form Consulting Agreement, which shall form a part hereof. Consulting Company will provide Sigma with a true copy of each such agreement, which shall be in the form of Exhibit 1 attached hereto and made a part hereof. Consulting Company further agrees to take any other steps reasonably required and/or appropriate to ensure compliance with the obligations set forth herein.

6.2.    Non -Disclosure. Consulting Company agrees that, except as directed by Sigma, Consulting Company will not at any time during or after the term of this Agreement or any Schedule use or disclose any Confidential Information to any person, or permit any person to examine and/or or make copies of any reports or any documents prepared by Consulting Company or that come into Consulting Company's possession or under Consulting Company's control by reason of Consulting Company's services or otherwise, and that upon termination of this Agreement, Consulting Company will turn over to Sigma all documents, papers and other matter in Consulting Company's possession or under Consulting Company's control that contain or relate to such Confidential Information, and will certify in writing that it has done so. Without prejudice to the above disclosure (if any) of Confidential Information to Consulting Company's own employees and subcontractors shall only be on a "need to know" basis.

6.3    Injunctive Relief. Consulting Company acknowledges that unauthorized use or disclosure of any Confidential Information by Consulting Company will give rise to irreparable injury to the Sigma Companies or the owner of such information (or Sigma Customer), inadequately compensable in damages. Accordingly, Sigma or such other party may seek and obtain injunctive relief against the breach or threatened breach of the foregoing undertakings, in addition to any other legal remedies which may be available. Consulting Company acknowledges and agrees that the covenants contained herein are necessary for the protection of legitimate business interests of the Sigma Companies and are reasonable in scope and content.

6.4    Proprietary Rights.

Consulting Company has provided services for Sigma and is continuing to provide services for Sigma at Sigma's request. Sigma shall have exclusive ownership of all work related to Consulting Company's duties. Consulting Company hereby assigns and transfers, and shall assign and transfer, to Sigma all of Consulting Company's right, title, and interest in and to all work performed by Consulting Company for Sigma, including, but not limited to, the "Intellectual Property" created or developed by Consulting Company in connection with the Consulting Services for Sigma. For purposes of this Agreement, "Intellectual Property" shall include all (i) formulae, techniques, concepts and processes,



4

(ii) electronic designs, hardware, software, creations, discoveries, manufacturing techniques, improvements, ideas, source code, data, research, financial statements, cost data, marketing and other business information (iii) all patent and inventor rights in the United States and foreign countries and applications therefore, (iv) all United States and foreign copyrights and all other literary property and author rights, whether or not copyrightable, (v) all know-how, whether or not protectable by patent, copyright, trade secret or other intellectual property right, and (vi) all materials incorporating, embodying, or representing any of the intellectual property, including computer tape(s) and disks, printouts, notebooks, drawings, artwork and other documentation.    All records, documents, programming specifications, source code, object code, diagrams, software and/or documentation created by Consulting Company for Sigma shall be and remain the exclusive property of Sigma.

6.5.   Assignment of Intellectual Property.   Consulting Company does hereby assign and agree to assign to Sigma or its designee, Consulting Company's entire right, title, and interest to any Intellectual Property created, developed, or made by Consulting Company for Sigma, which is developed, in whole or in part, through the use of Sigma's equipment, supplies, facilities or trade secrets, or which relates, directly or indirectly, at the time of conception or reduction to practice, to any work or services performed by Consulting Company for Sigma.    Consulting Company agrees to disclose all intellectual property made by Consulting Company to Sigma in confidence in order to permit a determination as to whether or not the intellectual property should be the property of Sigma.    Consulting Company shall execute any and all documents and legal instruments as may be requested by Sigma from time to time to carry out the terms of this Section 6.5 and shall arrange for its employees, consultants and sub-contractors to do the same upon the request by Sigma. In the event that Consulting Company does not execute the requested documents promptly after Sigma's request, Consulting Company hereby appoints Sigma as Consulting Company's attorney-in-fact for the limited purpose of executing any and all such documents in Consulting Company's name as if Consulting Company had actually signed same itself. Where there are modifications to pre-existing material owned by Consulting Company which are inseparable from or used in the Consulting Services provided herein, the owner of the pre-existing material shall grant Sigma an irrevocable, royalty free, fully transferable world-wide license to use such modifications. The provisions of Article 6 shall survive termination of this Agreement.

7.   WARRANTIES.  Consulting Company warrants and undertakes to Sigma that:

(a) it shall ensure that its subcontractors (in the event subcontracting has been approved by Sigma) shall be subject to provisions identical in all material respect to confidentiality and intellectual property and termination provisions of this Agreement; (b) all materials, deliverables and products developed under this Agreement will be original works of authorship and Sigma shall receive free,



5

good and clear title to all such materials, deliverables and products; (c) it will license to Sigma or procure licenses for Sigma in respect of all software tools, software and facilities detailed in the Schedules; (d) each and every deliverable, including software deliverables, contemplated by a Schedule shall conform to the specifications for same as mutually agreed to in writing by Sigma and Consulting Company and shall meet the functional performance and reliability requirements of Sigma as set forth on the applicable Schedule and (e) Consulting Company further warrants that (i) it has the legal capacity to enter into this Agreement, (ii) it has the right to provide the services, deliverables and any other products or systems which are listed in the Schedules, (iii) its entrance into this Agreement does not violate any related agreements which Consulting Company may have with third parties, (iv) it is not a party to any contract and does not have any obligations, and it will not enter into a contract or assume any obligation during the term of this Agreement, that could or will in any manner interfere with Consulting Companys' duties and responsibilities under this Agreement and (v) the products and services to be furnished pursuant to this Agreement do not infringe on any patent, copyright, trade secret or other protected interest of a third party.

8.  GENERAL

8.1.  Timeliness of Performance. Consulting Company understands that prompt performance of all services hereunder is required by Sigma in order to meet its schedules and commitments. In the event that any anticipated or actual delays in meeting Sigma' deadlines or scheduled completion dates are caused by the unacceptable performance of any Consulting Company employee or any other cause within the reasonable control of Consulting Company, Consulting Company shall provide additional temporary personnel, as requested by Sigma and at no charge to Sigma, in order to complete the assignment involved in a timely manner. Neither party, however, shall be responsible for any delays that are not due to such party's fault or negligence or that could not have reasonably been foreseen or provided against.

8.2.  Term and Termination. This Agreement shall begin on the Effective Date and shall continue for a period of one (1) year (the "Term"). Unless either party provides sixty (60) days prior written notice of its intent not to renew, this Agreement shall be renewed automatically for successive one year Terms on the same terms as provided in this Agreement. Sigma may terminate this Agreement at any time upon providing Consulting Company with thirty (30) days advance written notice, provided that Sigma may terminate this Agreement immediately and without any payment in lieu of notice if Consulting Company is not capable of performing any service. In the event Consulting Company is not capable of performing the Consulting Services, Sigma shall be entitled to employ any person or persons to complete such services; and either party may terminate this Agreement immediately without notice if the other party shall be (a) shall be guilty of fraud, dishonesty or serious misconduct. (b) makes an assignment for the



6

benefit of, or a composition with, its creditors, or another arrangement of similar import; (c) a receiver, administrative receiver, administrator or similar officer is appointed to the other party or over all or any part of the assets or undertaking of the other party; (d) shall go into liquidation (otherwise than for the purposes of an amalgamation or reconstruction previously approved in writing by the other party); (e) is dissolved, adjudged bankrupt or insolvent or is otherwise rendered incapable of performing its obligations under this Agreement without the consent of a third party.

8.3 <u>Effect of termination.</u> Any termination or expiration of this Agreement shall be without prejudice to any rights of the parties accrued up to the date of such termination or expiration or to any obligations under this Agreement which are intended or expressed to survive such a termination or expiration. On termination of the Agreement Consulting Company shall:

    (a)    immediately deliver up to Sigma all deliverables and property belonging to Sigma which may be in the possession of, or under the control of Consulting Company; and

    (b)    undertake to procure from its employees or subcontractors (or their personal representatives) that they shall immediately deliver up to Sigma all deliverables and property belonging to Sigma which may be in the possession of or under the control of its personnel or their personal representatives.

To the extent that any of the deliverables and property referred to above are in electronic form and contained on non-detachable storage devices, Consulting Company shall provide Sigma with unencrypted copies of the same on magnetic media and shall irretrievably destroy and delete copies so held.

8.4 <u>Force majeure.</u> Neither party shall be liable for any delay or failure to meet its obligations (other than a payment obligation) under this Agreement due to any cause outside its reasonable control including (without limitation) acts of God, war, riot, malicious acts of damage by third parties, civil commotion, strike, lockout or industrial dispute by a third party, unavoidable power failure or fire. If performance of the obligations in this Agreement is substantially prevented for a continuous period of one month or more by virtue of any of the aforesaid events, then either party may terminate this Agreement by written notice to the other party.

8.5 <u>Assignment.</u> This Agreement shall be binding upon the parties' respective successors and permitted assigns. Consulting Company shall not assign this Agreement or any of its rights or obligations hereunder (by operation of law or otherwise) without the prior written consent of Sigma, and any such attempted assignment shall be void. No work to be performed by Consulting Company

7



hereunder shall be subcontracted to or performed on behalf of Consulting Company by any third party, except upon written permission by Sigma and is conditional on such subcontractor being subject to all terms and conditions of this Agreement. Consulting Company agrees that any assignment hereunder shall not relieve Consulting Company of its obligations hereunder.

8.6   Notices. Any notices or communication under this Agreement shall be in writing and shall be hand delivered or sent by registered mail return receipt requested or by confirmed facsimile transmission to the party receiving such communication at the address specified below: If to Sigma at: 118 East 28th street, Suite 901, New York NY 10016 USA, Fax number: +1(212) 532-0520, Attention: Harry Singh; if to Consulting Company at: 1790A Technology Drive, San Jose CA 95110 USA, Fax number: +1 (408) 436-7508, Attention: Vikas Sehgal, or such other address as either party may in the future specify to the other. A notice shall be deemed to have been received if sent by registered mail, within forty eight (48) hours after dispatch, (b) if sent by fax, within 12 hours after dispatch (with correct answer back), or (c) by hand delivery – immediate upon receipt by the recipient.

8.7   Miscellaneous. This Agreement shall be construed in accordance with the laws of the State of New York without giving effect to principles of conflict of laws. Except with respect to the Sigma's right to pursue remedies relating to any breach by Consultant of any of the provisions of Sections 6.1 and 6.2, any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by final and binding arbitration. Except as hereinafter set forth, any such arbitration shall be conducted in New York in accordance with the then existing rules (the "Rules") of the American Arbitration Association ("AAA") and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. If Consultant breaches any of its obligations under Sections 6.1 and 6.2. Sigma shall be entitled to equitable relief to protect its interests, including, but not limited to, injunctive relief, as well as money damages. If any of the provisions of this Agreement are held to be void or unenforceable, the parties agree that such determination shall not result in the nullity or unenforceability of the remaining portions of this Agreement. No change in, modification of or addition to the terms and conditions contained herein shall be valid as between the parties, unless set forth in a writing which is signed by authorized representatives of both parties and which specifically states that it constitutes an amendment to this Agreement. No waiver of any term, provision, or condition of this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or be construed as, a further or continuing waiver of any other term, provision or condition of this Agreement. This Agreement is the complete and exclusive statement of the agreement between the parties, and supersedes all prior written and oral communications and agreements relating to the subject matter hereof.



8.8. Non-Solicitation. Unless otherwise mutually agreed to in advance by the parties in writing, Consulting Company agrees not to directly or indirectly approach, solicit or enter into any business arrangement with any customer of Sigma directly or indirectly associated with Consulting Company's work effort during the term of this Agreement and neither party shall directly or indirectly solicit or hire as employee, any employee of the other party or any employee of client's for the other party, without the other party's prior written consent . The obligations of the preceding sentence shall continue during the Term of this Agreement, including any renewals thereto and for a period of three (3) years thereafter. Consulting Company agrees that during the term of this Agreement and for a period of three (3) years thereafter, it will not directly or indirectly, individually or with any other person or organization enter into or engage in the research, engineering, design, manufacture or sale of any product or product lines that compete with Sigma's business. Without limiting or reducing any rights of Sigma in this Agreement, Consulting Company shall not sell or create any product or service out of all or any portion of the Consulting Services performed for Sigma under this Agreement. Consulting Company represents that its experience, capabilities and circumstances are such that the non-competition and non-solicitation provisions herein will not present Consulting Company from conducting its business and the limitations set forth herein are reasonable and properly required for the adequate protection of Sigma. This provision as well as any other provision contained in this Agreement which, by its terms, requires or contemplates performance by the parties after the expiration or termination of this Agreement shall be enforceable notwithstanding any expiration or termination and shall survive the expiration or termination of this Agreement.

8.9 Viruses. Consulting Company warrants that it has used best endeavours during the writing of any software to ensure that no viruses are coded or introduced to the software. Consulting Company agrees in the event that a virus is found, Consulting Company shall use at its own expense best endeavours to assist Sigma in reducing the effect of the virus and particularly in the event that a virus causes loss of operational efficiency and/or loss of data to assist Sigma to the same extent to mitigate such losses and to restore Sigma to its original operating efficiency.

8.10 Liability. Sigma releases Consulting Company from all claims by its clients or third parties, arising as a result of defects or damages by the use of software devlivered by Consulting Company to Sigma. It would be the responsibility of Sigma to test and satisfy itself of the Quality of the software delivered by Consulting Company before distributing or installing at its client's sites.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their respective duly authorized representatives, as of the Effective Date.



9

Sigma Six Technologies, Inc.

By: _Harry Singh_

Name: _HARRY SINGH_

Title: _PRESIDENT_

Consulting Company _Vikas Sehgal_

By: _Navarro Inc._ 11/01/2002

Name: _Vikas Sehgal_

Title: _President_

10

P.10

Schedule A

1. Consulting Services shall include the following:

Consulting Company shall provide Sigma with a four (4) member team dedicated to performing work on a full time basis for Sigma during the Term. The Consulting Company shall develop for Sigma a service management application to be used by Sigma's customer at such customer's site(s) to manage information technology outsourcing. Such application or product shall be developed using Microsoft and other programming tools and databases. The term of services for this project is from December 1, 2001 till March 2003.

2. The fee ("Fee") for the Consulting Services shall be $12,500 per calendar month based on a four (4) member dedicated full time team, provided that for the months of December 2001 and January 2002, the total Fee shall be $7,500, and for the month of February, 2002, the Fee shall be $10,000 per month. The Fee shall include office and infrastructure expenses and Sigma shall use best efforts to initiate telephone calls to the team to minimize telephone charges to Consulting Company.

3 Sigma shall select the team after reviewing and interviewing the team. Sigma will conduct a technical review of the team members every 3 months. Failing members will be replaced by Nagarro. The parties hereby agree that Deepak Khajuria shall be a key member of the team and Rajiv Dahiya shall be the responsible contact person at Consulting Company. Consulting Company hereby agrees that the team assigned to Sigma shall possess the appropriate skills necessary for the tasks they are assigned. If the team fails to have any of such skills the Consulting Company shall at no extra charge provide the skills to support a project requiring such technologies.

4. If Consulting Company team members are needed on a Sigma customer site in Europe or USA, Sigma shall pay for the room and board and local transportation of the team, including a per diem of no less than $50 per day. Sigma will be responsible for economy class airfare. However, if the duration of onsite stay is more than 4 weeks and if the travel destination is a European city, Consulting Company will pay for the cost of airfare.

5. Consulting Company shall make the following in its India office: (i) high speed Internet access; (ii) development/staging server available remotely for testing quality assurance; (iii) e-mail/workgroup for the team; (iv) and a bug tracking system. Consulting Company will also take appropriate measures to get a CMM level 3 certification status within the next one year.

11

# EXHIBIT 1
## *CONSULTANT AGREEMENT*

This Consultant Agreement ("Agreement") is made effective December 1, 2001 (the "Effective Date"), by and between Sigma Six Technologies Inc., having its principal place of business at 118 East 28th Street, Suite 901, New York, NY  10016 (the "Company") and **Neelakshi Nalawade,** having an address at 3, **Type B, Electronics City, Sector 18, Gurgaon, Haryana, India** ("Consultant").

In consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     DUTIES AND RESPONSIBILITIES.  The Consultant shall devote his or her best efforts to the interests of the Company and shall not engage in other employment or in any activities detrimental to the best interests of the Company, without the prior written consent of the Company. Notwithstanding anything to contrary contained herein, the Consultant hereby acknowledges and agrees that he or she is an at will consultant with the Company and that his or her Consulting Services may be terminated by the Company in its discretion at any time.

2.     CONFIDENTIAL INFORMATION.    In the course of his or her Consulting Services, Consultant may obtain access to, or learn, Confidential Information of the Company. For purposes of this Agreement, "Confidential Information" shall include, but not be limited to, information concerning the Company's operations, products, customers, trade secrets, data processing systems and components, formulae, processes, research, cost data, mechanisms of activity, technical know-how, pricing, software programs (including source code), business plans, personnel, projects in process, finances or any other information designated by the Company in writing as Confidential Information, or otherwise subject to reasonable efforts to maintain the secrecy thereof. Consultant shall not disclose to any third party, or allow any third party to examine, copy or learn of, any Confidential Information without the express written consent of the Company, and Consultant shall not use any Confidential Information except as required in the course of providing the Consulting Services.

3.     ASSIGNMENT OF WORK PRODUCT.  Consultant has provided services for the Company and is continuing to provide services for the Company at the Company's request. The Company shall have exclusive ownership of all work related to Consultant's duties. Consultant hereby assigns and transfers, and shall assign and transfer, to the Company all of Consultant's right, title, and interest in and to all work performed by Consultant for the Company, including, but not limited to, the "Intellectual Property" created or developed by Consultant in connection with his or her Consulting services to the Company. For purposes of this Agreement, "Intellectual Property" shall include all (i) formulae, techniques, concepts and processes, (ii) electronic designs, hardware, software, creations, discoveries, manufacturing techniques, improvements, ideas, source code, data, research, financial statements, cost data, marketing and other business information (iii) all patent and inventor rights in the United States and foreign countries and applications therefore, (iv) all United States and foreign copyrights and

all other literary property and author rights, whether or not copyrightable, (v) all know-how, whether or not protectable by patent, copyright, trade secret or other intellectual property right, and (vi) all materials incorporating, embodying, or representing any of the intellectual property, including computer tape(s) and disks, printouts, notebooks, drawings, artwork and other documentation. All records, documents, programming specifications, source code, object code, diagrams, software and/or documentation created by Consultant for the Company shall be and remain the exclusive property of the Company.

4.    INVENTIONS, COPYRIGHTS, AND OTHER WORKS OF AUTHORSHIP. Consultant does hereby assign and agree to assign to the Company or its designee, Consultant's entire right, title, and interest to any Intellectual Property created, developed, or made by Consultant for the Company, which is developed, in whole or in part, through the use of the Company's equipment, supplies, facilities or trade secrets, or which relates, directly or indirectly, at the time of conception or reduction to practice, to either: (a) the Company's business or actual or demonstrably anticipated research or development; or (b) any work or services performed by Consultant for the Company. Consultant agrees to disclose all intellectual property made by Consultant to the Company in confidence in order to permit a determination as to whether or not the intellectual property should be the property of the Company. Consultant shall execute any and all documents and legal instruments as may be requested by the Company from time to time to carry out the terms of this Section 4. In the event that Consultant does not execute the requested documents promptly after the Company's request, Consultant hereby appoints the Company as Consultant's attorney-in-fact for the limited purpose of executing any and all such documents in Consultant's name as if Consultant had actually signed same itself.

5.    REPRESENTATION AND WARRANTIES OF CONSULTANT. Consultant represents and warrants to the Company that the performance of his or her duties hereunder and the resultant work product, will not infringe any patent, copyright, trademark, trade secret or other proprietary right of any third party. Consultant further represents and warrants to the Company that it will not use any trade secrets or confidential or proprietary information owned by any third party in performing his duties without such third party's written consent. Consultant further warrants and represents that he or she is not a party to any other agreement which will interfere with Consultant's full compliance with this Agreement.

6.    GENERAL PROVISIONS.

6.1    Governing Law/Arbitration. This Agreement shall be construed in accordance with the laws of the State of New York without giving effect to principles of conflict of laws. Except with respect to the Company's right to pursue remedies relating to any breach by Consultant of any of the provisions of Section 2, any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by final and binding arbitration. Except as hereinafter set forth, any such arbitration shall be conducted in New York in accordance with the then existing rules (the "Rules") of the American Arbitration Association ("AAA") and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

6.2    Equitable Remedies.    If Consultant breaches any of its obligations under Section 6, the Company shall be entitled to equitable relief to protect its interests, including, but not limited to, injunctive relief, as well as money damages.

6.3    Severability.    If any of the provisions of this Agreement are held to be void or unenforceable, the parties agree that such determination shall not result in the nullity or unenforceability of the remaining portions of this Agreement.

6.4    Miscellaneous.    No change in, modification of or addition to the terms and conditions contained herein shall be valid as between the parties, unless set forth in a writing which is signed by authorized representatives of both parties and which specifically states that it constitutes an amendment to this Agreement. No waiver of any term, provision, or condition of this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or be construed as, a further or continuing waiver of any other term, provision or condition of this Agreement. The Consultant may not assign any of his or her rights under this Agreement, nor to delegate any of his or her duties or obligations under this Agreement, without the prior written consent of the Company. This Agreement is the complete and exclusive statement of the agreement between the parties, and supersedes all prior written and oral communications and agreements relating to the subject matter hereof. The provisions of Sections 2, 3, 4 and 6 herein shall be enforceable and in effect for a period of 4 years from the date the Consultant ceases to be employed by the Company.

6.5    CONSULTANT CERTIFIES AND ACKNOWLEDGES THAT HE OR SHE HAS CAREFULLY READ ALL OF THE PROVISIONS OF THIS AGREEMENT AND THAT HE OR SHE UNDERSTANDS AND WILL FULLY AND FAITHFULLY COMPLY WITH SUCH PROVISIONS.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

CONSULTANT

Signature: _____

Name: **Neelakshi Nalawade**

Address:    **3, Type B, Electronics City, Sector 18, Gurgaon, Haryana, India**

SIGMA SIX TECHNOLOGIES INC.

By: _____
    Harry Singh, Director